**UNITED STATES of America, Plaintiff,**

v.

**William A. LEIGH, Ronald L. Robinson, Defendants.**

**No. CR–3–80–13.**

United States District Court, S. D. Ohio, W. D.

May 11, 1981.

On Motion for Acquittal May 29, 1981.

James C. Cissell, Bernard J. Gilday, Jr., Cincinnati, Ohio, for plaintiff.

Thomas R. Smith, Cincinnati, Ohio, for defendant Leigh.

Daniel J. O'Brien and James W. Knisley, Dayton, Ohio, for defendant Robinson.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR NEW TRIAL; DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR ACQUITTAL; FURTHER DECISION TO FOLLOW AMPLIFYING REASONS FOR DENIAL OF MOTION FOR ACQUITTAL; CONFERENCE CALL SET TO DETERMINE NEW TRIAL DATE

RICE, District Judge.

The defendants, William A. Leigh and Ronald L. Robinson, were indicted on seven counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. The matter came on for trial before a duly impaneled jury.

During the government's case in chief, and again at the conclusion of the government's case, the defendants moved for judgment of acquittal. The Court denied both motions. Thereafter, both defendants presented evidence in their behalf. At the end of all the evidence, defendants again moved for judgment of acquittal, and the Court again denied their motion.

The jury was charged and the case submitted. The jury returned guilty verdicts as to both defendants on all eight counts of the indictment. The matter is now before the Court on the defendants' renewed motion for judgment of acquittal, Fed.R. Crim.P. 29, or, in the alternative, for new trial. Fed.R.Crim.P. 33.

After extensive briefing by all counsel, and further after spirited oral argument by all concerned, this Court upon consideration of the foregoing and the following, based upon its research and the research of counsel, is of the opinion that the motion for judgment of acquittal is not well taken and same is, therefore, overruled in its entirety. Ruling further, it is the opinion of this Court that the motion for new trial is well taken and same is, therefore, sustained. A new trial will, accordingly, be granted to both defendants.

After briefly setting forth the background of this case and certain pertinent aspects of the trial, the Court will discuss its reasons for concluding that the defendants are entitled to a new trial. Thereafter, the Court will address defendants' remaining contentions, asserted under both the motion for new trial and for acquittal, and set forth its reasons for rejecting same.

## I. BACKGROUND

The criminal charges in this case stem from a contract entered into by the State of Ohio and the joint venture of Madden, Inc.- L. B. Robinson, Inc. At all times relevant to this case, defendant Leigh was president of Madden, Inc., and Robinson was president of L. B. Robinson, Inc. The subject of the contract was the rebuilding of the Banneker Science Building at Central State University, which, along with several other buildings on campus, had been damaged by a tornado which struck the area in the spring of 1974.

Under Count I of the indictment, defendants were charged with conspiring "to unlawfully, wilfully and knowingly devising and intend[ing] to devise a scheme and artifice to defraud and to obtain money and property from the State of Ohio by means of false and fraudulent pretenses and representations," and for knowingly causing envelopes containing checks to be delivered to the joint venture from the State of Ohio for the purpose of executing the scheme. As part of the conspiracy, defendants were alleged to have "decided to ... falsify ... figures provided to the State of Ohio ..." which "were supposed to represent actual costs incurred in the rebuilding of the Banneker Science Building ..." (Count I, # 1); to have created "false documentation to justify the inflated figures provided to the State of Ohio ..." (*id.* # 2); and to have verified the inflated amounts of payroll and equipment costs as "true and accurate when the State of Ohio required such verification" (*id.* # 3).

Nine overt acts were alleged. The first concerned the defendants' agreement to falsify information regarding the contract "in order to obtain larger amounts of money than they were entitled to obtain" (Overt Acts, # 1). The remaining overt acts relate to partial payment requests or draws submitted to the State of Ohio on eight different occasions, each of which was alleged to have contained inflated amounts for costs incurred by the defendants.

The substantive mail fraud counts charge the defendant with having devised a scheme to defraud the State of Ohio and "to obtain money and property by means of false and fraudulent pretenses and representations." The first three numbered paragraphs of Count II, which are incorporated and realleged in the remaining six counts, closely track the three numbered paragraphs of the conspiracy count. The final numbered paragraphs of Counts II– VIII charge the defendants, as part of the scheme, on seven different dates, with

knowingly causing "to be delivered by the United States Postal Service . . . a check in an envelope addressed to" the joint venture.

At trial, the nature of the contractual relationship between the State of Ohio and the joint venture was vigorously contested. The controversy centered on whether the contract was a lump sum or a cost plus maximum contract. A lump sum contract is one in which a lump sum price, agreed upon by the parties, is to be paid by the owner regardless of the costs actually incurred by the contractor in performing the work, and is to be accepted by the contractor regardless of his actual costs. Thus, the owner agrees to pay a certain price for the work, and that is the amount he pays, even if the contractor's costs are less than, or in excess of that amount.

A cost plus maximum contract is one in which, if the contractor's costs, plus the agreed upon sum for profit and overhead, is less than the maximum specified in the contract, the difference between the contractor's costs plus profit and overhead, and the maximum amount, is retained by the owner. If the contractor's costs exceed the maximum fixed by the contract, the contractor bears the loss. Under a cost plus maximum contract, the contractor would receive the total amount specified in the contract only if his costs, plus the agreed upon percentage for profit and overhead, equalled the maximum amount of the contract.

It was defendants' position throughout trial that if the contract were found to be a lump sum contract, they must be acquitted on all counts of the indictment. They asserted that this type of contract entitled them to receive the total amount specified therein, and was in no way conditioned or dependent upon their method of computing or documenting their costs. Thus, under defendants' theory of the case, acquittal was mandated if the jury found beyond a reasonable doubt that the contract was lump sum for the reason that they could not possibly have received more money than they were contractually entitled to receive, and, therefore, could not possibly have de-frauded the State of Ohio, under the scheme alleged.

The government's position altered during the course of trial. In opening argument, counsel for the government characterized the contract as a "time-material-maximum" contract. However, the government later adopted the position that the nature of the contract was not a key factor in determining the guilt or innocence of the defendants. Briefly, it was the government's position by the end of trial that if the contract were found to be a cost plus maximum contract, defendants could be convicted on the theory that they had submitted inflated cost documentation and as a result of so doing, received more money than they were entitled to receive, thereby, defrauding the State. In the alternative, the government contended, if the contract were found to be a lump sum contract, which entitled defendants to receive the total price specified, the defendants could nonetheless be convicted of the charges because impossibility to consummate a fraud is no defense, and the defendants had had the intent to defraud the State, which is all that is required under the applicable statutory provisions.

After much discussion between the Court and counsel, the Court charged the jury that there were two crucial issues to be resolved by it. First, "the nature of the contract entered into between the joint venture and the State of Ohio," and second, "the state of mind or intention of the defendants with respect to that contract." (Instructions, at 5001) After further charging the jury on various matters of contract construction, the Court instructed the jury that there were four alternatives for it to consider in determining the guilt or innocence of the defendants. *Id.* at 5006–a. Two of the numbered alternatives would result in a determination of guilt, one under a lump sum contract and one under a cost plus maximum contract. The remaining two numbered alternatives would result in a determination of innocence, one under a lump sum contract and the other under a cost plus maximum contract. *Id.* at 5006–a–c. Immediately following these alterna-

tives, the Court instructed the jury that if it were unable to determine the nature of the contract beyond a reasonable doubt, then it must acquit the defendants on all counts. *Id.* at 5006–d.

Upon completion of the entire charge, the case was submitted and, after due deliberation, the jury returned general verdicts of guilty, as against both defendants on all eight counts of the indictment.

## II. AMENDMENT OF INDICTMENT BY COURT'S INSTRUCTION TO JURY

The defendants contend that the first numbered alternative in the Court's instructions to the jury ("Alternative # 1") created a fatal amendment to or variance from the indictment, which materially prejudiced their rights by permitting the jury to convict them on a theory not contemplated by the indictment. The government reasserts its position that impossibility is no defense to fraud; thus, it makes no difference whether defendants actually did obtain more money than provided by the contract.

■ Having carefully considered this matter, and after closely scrutinizing this portion of the instruction in light of the indictment, the Court is of the opinion that defendants' contention is well taken. Although the instruction given is theoretically correct and legally sound under the language of the applicable criminal provisions, it appears to the Court that the indictment, when fairly read, is premised on the existence of a cost plus maximum contract between the State of Ohio and the joint venture. This being the case, the jury should not have been permitted the latitude to return verdicts of guilt against the defendants if it found the contract to be a lump sum contract. Consequently, for the foregoing reasons, as stated more fully below, the Court concludes that Alternative # 1 of the Court's instruction constituted an impermissible amendment to the indictment, and defendants are, therefore, entitled to a new trial.

The right of an accused to rely on the indictment handed down against him is well settled. In 1887, the Supreme Court articulated the reasons against permitting deviations from an indictment:

> If it lies within the province of a court to change the charging part of an indictment to suit its own notion of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to the suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed.

*Ex parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887).

This principle has suffered no erosion with the passage of time. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Court reaffirmed its position. The issue presented to the Court in that case, involving a conviction for interfering with interstate commerce in violation of the Hobbs Act, was "whether [petitioner] was convicted of an offense not charged in the indictment." *Id.* at 213, 80 S.Ct. at 271. The only interstate commerce mentioned in the indictment was the importation into Pennsylvania of sand to be used in building a steel plant there, *id.*; however, over objection, the trial court also permitted the government to present evidence of an effect on interstate commerce "in steel shipments from the steel plant in Pennsylvania into Michigan and Kentucky." *Id.* at 214, 80 S.Ct. at 271.

In its instruction, the trial judge charged the jury that petitioner could be convicted:

> [E]ither on a finding that (1) sand used to make the concrete "had been shipped from another state into Pennsylvania" or (2) "Mr. Rider's concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce ..." from Pennsylvania into other States.

*Id.* The trial court overruled the petitioner's motion for judgment of acquittal or

new trial because "[a] sufficient foundation for introduction of both kinds of proof was laid in the indictment." The Court of Appeals affirmed the conviction.

The Supreme Court reversed. It began its discussion with reference to *Ex parte Bain* :

> Ever since *Ex parte Bain* ... was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.

*Id.* at 215–16, 80 S.Ct. at 272. The Court quoted from *Bain, supra,* 121 U.S. at 13, 7 S.Ct. at 787:

> "[A]fter the indictment was changed it was no longer the indictment of the grand jury who presented it. Any other doctrine would place the rights of the citizens, which are intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney ..."

361 U.S. at 216–17, 80 S.Ct. at 273.

The Court noted that "[t]he *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Id.* at 217, 80 S.Ct. at 273. The Court determined that this rule had been violated in the case presented, and explained:

> [I]t cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charges made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same ... While there was a variance in the sense of a variance between the pleading and proof, that variation destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing

more than a variance and then dismissed as harmless error.

*Id.*

The Court focused on the source of the error in the trial court, stating, "[W]hen only one particular kind of commerce is charged to have been burdened, a conviction must rest on that charge and not another, *even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.*" *Id.* at 218, 80 S.Ct. at 274 (emphasis added). In closing, the Court emphasized that "[t]he right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *Id.* at 219, 80 S.Ct. at 274.

The Sixth Circuit position with respect to deviations from the indictment is wholly consistent with *Ex parte Bain* and *Stirone.* In *Watson v. Jago,* 558 F.2d 330, 331 (6th Cir. 1977), the Court reversed the trial court's denial of writ of habeas corpus to a petitioner who claimed that he had been denied due process in state proceedings when "he was forced ... to defend against a charge of felony-murder, which was not contained in the indictment." The Court started with the settled rule "that after an indictment has been returned its charges may not be broadened except by the grand jury itself." *Id.* at 333, *citing, Ex parte Bain, supra; Stirone v. United States, supra.*

The Court noted that neither *Bain* nor *Stirone* prohibits a court from changing an indictment as to matters of form or surplusage, *id.,* and further noted that there is a distinction between an amendment and a variance.

> "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed on them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

*Id.* at 334, *quoting, Gaither v. United States,* 413 F.2d 1061, 1971 (D.C.Cir.1969). A further distinction between the two is that "a variance is subject to the harmless error rule . . . whereas an amendment prohibited by *Stirone* and *Bain* is prejudicial per se." *Id.*

Identifying the error in *Stirone* as a "constructive amendment, the Court stated that the question to be considered "in identifying a constructive amendment is whether there has been a modification at trial in the elements of the crime charged." *Id.* In the case under consideration, the Court determined that such a modification had occurred at the appellant's trial because the grand jury had not "put such a felony-murder count in the indictment." *Id.* at 336.

The Sixth Circuit again considered variances and amendments a year later, in *United States v. Beeler,* 587 F.2d 340 (6th Cir. 1978). The Court reversed the appellant's conviction for a violation of the Hobbs Act because it found a fatal variance between the indictment and the proof at trial. In succinct fashion, the Court again identified the distinguishing factors between an amendment and a variance:

> A variance occurs when the proof introduced at trial differs materially from the facts alleged in the indictment. In contrast, an amendment involves a change, whether literal or in effect, in the terms of the indictment. Amendments have been held to be prejudicial *per se* while variances may be subject to the harmless error rule. Variances which create "substantial likelihood" that a defendant may be "convicted on an offense other than that charged by the grand jury" constitute constructive amendments. Courts apply the prejudicial *per se* approach to such variances."

*Id.* at 342 (citations omitted).

The Court also explained the underlying rationale of these rules:

> "[They] include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further

prosecution for the same offense, and finally, of "paramount importance," the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for determination of the defendant's guilt or innocence."

*Id.* Having determined that the government introduced proof concerning allegations that did not appear in the indictment, the Court reversed the judgment of the trial court and remanded the case "for further proceedings not inconsistent herewith." *Id.* at 343.

Considered in light of the foregoing authorities, the Court believes that Alternative # 1 of its instructions impermissibly introduced for the jury's consideration a theory of guilt which was not set forth in the indictment, and, therefore, created the potential for the jury to return guilty verdicts against the defendants on charges not made against them by the grand jury. Alternative # 1 reads as follows:

> If you the Jury find that the contract in question is a lump sum or fixed price contract, but that the defendants considered it a cost plus maximum contract, then the defendants can legally be found guilty on all eight counts, provided all the requisite elements of the offenses charged have been shown beyond a reasonable doubt. The defendants would have contemplated some actionable harm to the State of Ohio (the intent to defraud would have been present) by submitting false and fraudulent cost bills, even though no harm did or could come to the State of Ohio, since the defendants were entitled to a certain sum regardless of the costs.

> If you the Jury find that the defendants possessed the requisite intent to defraud, along with the other requisite elements of the offenses charged, then it is no defense to the counts charged that the defendants received only the amount to which they were entitled under the contract. Impossibility to consummate the

fraud is no defense so long as you find that the defendants contemplated some actual harm to the State of Ohio. *United States v. Waldron*, 590 F.2d 33, 34 (1st Cir. 1979), *cert. denied*, 441 U.S. 934 [99 S.Ct. 2056, 60 L.Ed.2d 662]; *United States v. Murray*, 527 F.2d 401, 412 (5th Cir. 1976). *See also*, LaFave & Scott, *Criminal Law*, Section 62 at 475–76.

Jury Instructions, at 5006–a–b.

The theory of guilt introduced in Alternative # 1 applied to all eight counts of the indictment. In effect, this instruction permitted the jury to find the defendants guilty of the offenses charged in the indictment if (a) it found that the contractual relationship between the State of Ohio and the joint venture was a lump sum contract, which obligated the State to pay the total amount specified, without regard to the defendants' actual costs, provided further, (b) that the jury also found that the defendants incorrectly *considered* the contract to be a cost plus maximum contract, which obligated the State to pay only that portion of the total amount specified, which was reflective of defendants' actual costs plus the agreed upon percentages for profit and overhead.

A fair and reasonable reading of the indictment leads to the conclusion that the above theory is *not* the theory of guilt *under which the defendants were charged by the grand jury.* In Count I, the defendants were charged with conspiring to devise a scheme in which they would (1) "falsify figures" that were supposed *to represent actual costs* incurred" (emphasis added); (2) they would create false documentation "to justify the inflated figures" of actual costs;

and (3) they would "verify [the] inflated amounts" as true and accurate." Additionally, the first overt act in the conspiracy count alleges that the defendants "discussed and agreed to falsify information provided to the State of Ohio in connection with said contract *in order to obtain larger amounts of money than they were entitled to obtain* (Count I, Overt Act # 1) (emphasis added).[1]

In Count II, the first of the substantive mail fraud counts, the indictment alleges that the defendants devised a scheme to defraud the State and "to obtain money and property by means of false and fraudulent pretenses and representations." Mirroring closely the allegations under the conspiracy count, parts of the scheme alleged included: "falsifying figures . . . that were *supposed to represent actual costs . . ."* (Count II, para. # 1) (emphasis added); creating false documentation to justify the inflated figures . . ." (id., para. # 2); and verifying the "inflated amounts" as "true and accurate . . . (id., para. # 3). The final numbered paragraph alleges the date upon which the defendants caused certain mail matter to be delivered to the joint venture as a further part of the scheme. Counts III–VIII incorporate and reallege the first three numbered paragraphs of Count II.

As the Court reads these allegations, the only reasonable conclusion that can be drawn is that it was assumed by the grand jury that the defendants were obligated to submit to the State figures which accurately represented the actual costs incurred by them on the project, and that the defendants devised and executed a scheme to cir-

---

1. In a chambers conference during trial, the Court informed counsel that it intended to read this paragraph as the allegation of the agreement between the defendants, and Overt Acts # 2–9 as the overt acts alleged in furtherance of said agreement. The primary reason for reading # 1 in this fashion is that it does not allege any act, in the sense of outward or objectively discernible conduct. Rather, it describes the nature of the agreement reached by defendants. However, the government strenuously objects to the Court's reading of the paragraph in this way on the ground that the Court is not permitted to amend the indictment to include an overt act as the allegation of the agreement. (See, Letter from Counsel for the Government, October 17, 1980, at 2)

The Court mentions this dispute merely to apprise counsel that resolution thereof is not required, since the Court's determination regarding the theory of guilt set forth in the indictment is not solely predicated on the language in Overt Act # 1, but is based on a reading of the allegations in the indictment, taken as a whole.

cumvent this obligation. Because a contractor's actual costs are only relevant to an owner under a cost plus maximum contract, in that the inflation or upward adjustment of those costs figures would cause the owner to pay more than he agreed to pay, it follows that the indictment was predicated on the existence of a cost plus maximum contract. Given the language of the allegations, all of which concern the defendants' agreement and efforts to misrepresent their actual costs, it is unreasonable to conclude, as the government contends, that the nature of the contract was irrelevant or that the indictment contemplated *either* a cost plus maximum or a lump sum contract. In short, the Court's instruction allowed the jury to find guilt, regardless of the nature of the contract, as long as the defendants felt that the scheme they entered into was for the purpose of receiving more than *they thought* they were entitled to. This was erroneous. The wording of the indictment in terms of "in order to obtain larger amounts of money than they were entitled to obtain," contained in Count I, Overt Act # 1, clearly calls for an objective determination of the nature of the contract and for an arithmetical comparison between actual dollar entitlement under the contract and the defendants' cost submissions. Any judicial attempt to read in a requirement that the jury must consider the question of what the defendants thought was the nature of the contract and the maximum compensation available thereunder, would not only be tantamount to an impermissible amendment, pursuant to the above authorities, but also would violate the well established axiom that criminal indictments must be strongly construed against the government. Guilt in this case could only be predicated

upon a finding that the contract in question was a cost plus maximum contract and that the defendants' scheme was intended to and did achieve a result whereby the defendants received larger amounts of money than they were actually arithmetically entitled to obtain.

This case is most closely akin to *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), *supra*, in which the trial court permitted the defendant to be tried and convicted under the Hobbs Act on charges that were not made in the indictment. By instructing the jury in Alternative # 1 that it was permitted to render guilty verdicts against the defendants on all eight counts of the indictment, even if it found the agreement to be a lump sum contract, the Court, in essence, permitted *the defendants to be convicted on charges that were not handed down by the grand jury*. The *Stirone* Court held that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened." *Id.* at 218, 80 S.Ct. at 274. So too, with respect to the case at bar, it may be assumed that under an indictment framed in general or, at least different, terms, a conviction might have correctly rested upon a showing that the contract was either lump sum or cost plus maximum.[2] However, where, as here, one particular type of scheme is alleged—one based on the existence of a cost plus maximum contract, obligating the defendants to report accurately their actual costs—a convic-

2. By way of explanation, this Court is fully cognizant of the well settled rule that success is not an element of the mail fraud statute or of conspiracy to commit mail fraud, or conversely, that impossibility to consummate a fraud is not a defense under these provisions. *E. g., Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Schaffer*, 599 F.2d 678, 680 (5th Cir. 1979); *United States v. Gross*, 416 F.2d 1205 (8th Cir. 1969); *Hoffman v. United States*, 249 F.2d 338 (9th Cir. 1957). Thus, it is within the realm of

theoretical possibility, consistent with the statutory provisions, for the grand jury to have handed down an indictment under which a conviction might have rested upon a showing of a scheme under a lump sum contract. However, the theoretical possibilities are not at issue in this case, and the Court must confine itself to the charges actually contained in the indictment. A theory of guilt predicated on a lump sum contract is not discernible from this indictment, and therefore, should not have been presented for the jury's consideration.

tion must rest on that charge and not on another theory such as one based on a lump sum contract, which defendants incorrectly believed to be a cost plus maximum.

Although Alternative # 1 of the instruction did not constitute a formal amendment to the indictment, it did create a constructive amendment thereto. Because it cannot be said "with certainty that with a new basis for conviction added [defendants were] convicted solely on the charge made in the indictment the grand jury returned," *Stirone*, at 217, 80 S.Ct. at 273, the harmless error rule is inapplicable. Therefore, based upon all of the foregoing, the Court concludes that Alternative # 1 of its instruction constituted a fatal variance from the indictment amounting to a constructive amendment thereto; thus, warranting the granting of defendants' motion for new trial.

Within 14 days from date of receipt of notice of this Decision, the Court will file a written decision setting forth its reasons for denying each branch of the defendants' Motion seeking an Order of the Court granting acquittal in the captioned cause. This Decision on the defendants' Motion for Acquittal will serve to establish the "law of the case" which will be applicable in the retrial of this action. Said Decision on the Motion for Acquittal will be filed in advance of the conference call established below.

Counsel listed below will take note that a conference will be had, by means of conference call telephone, for the express purpose of setting a new trial date in the captioned cause, at 8:55 a. m. on Wednesday, May 27, 1981.

### ON MOTION FOR ACQUITTAL

In a decision rendered on May 11, 1981, this Court sustained the Defendants' motion for a new trial, and overruled their motion for judgment of acquittal. The Court also informed the parties that a further decision would be forthcoming to consider matters not specifically addressed in the May 11th decision, and that said further decision would serve to establish the "law of the case" applicable in the retrial of this action.

In the discussion which follows, the Court will address three remaining contentions under Defendants' joint motion for judgment of acquittal, to wit: (1) that there was insufficient evidence from which the jury could have determined beyond a reasonable doubt that the contract was a cost plus maximum; (2) that there was no evidence from which the jury could have found that checks (as opposed to warrants) were mailed, as alleged in the indictment; and (3) that there was no evidence from which the jury could have found that the conspiracy continued in existence until March 13, 1980, as alleged in the indictment. Thereafter, the Court will also address two contentions raised by Defendant Leigh in a supplemental memorandum. The first concerns an extrajudicial statement made by Defendant Robinson to an FBI agent, about which the agent testified at trial. The second concerns the government's use of peremptory challenges to excuse prospective black jurors.

*I. Sufficiency of the Evidence Regarding the Nature of the Contract as a Cost Plus Maximum.*

The ultimate issue to be resolved on a motion for judgment of acquittal under Rule 29, Fed.R.Crim.P., is "whether there is sufficient evidence before the Court, from which reasonable jurors might properly conclude guilt beyond a reasonable doubt." *United States v. Shafer*, 384 F.Supp. 496, 497–98 (N.D.Ohio, 1974). In its May 11, 1981, Entry, this Court concluded that if the contract between the State of Ohio and the joint venture was a lump sum contract, or restated, if the government failed to prove beyond a reasonable doubt that the contract was a cost plus maximum, then the Defendants must be acquitted on all counts of the indictment. Thus, the precise question presented here is whether there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the contract was a cost plus maximum contract.

Preliminarily, the Court must again consider whether the nature of the contract should have been determined by the Court

as a matter of law. From the outset of the proceedings, the Defendants have maintained that the matter should not have been submitted to the jury. However, for the reasons stated below, the Court is satisfied that its decision to submit the question concerning the nature of the contract to the jury comports with the applicable legal principles, and was, therefore, proper.

In support of their contention that the nature of the contract was a question for the Court and not the jury, Defendants placed heavy reliance on *Alexander v. Buckeye Pipe Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978). Therein, speaking through its syllabus, the Court held: "The construction of written contracts and instruments of conveyance is a matter of law." 347 N.E.2d at 146 (Syllabus # 1). The dispute in that case centered on the interpretation of the term, "alongside of." The Court found no ambiguity in the term, and stated in the body of the opinion, "where the terms in an existing contract are clear and unambiguous, this Court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Id.* 347 N.E.2d at 150.

This Court does not dispute that the rule of law reflected in the *Alexander* Court's syllabus is a correct statement of the general rule regarding contract construction. However, the Court cannot agree that the statement is an absolute rule, without exception, which requires automatic application whenever a contract or terms thereof are in dispute.

In *Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276 (6th Cir. 1974), the parties disagreed on the question whether the Plaintiff had complied with the terms of the collective bargaining agreement. The agreement provided in pertinent part: " 'appeal from discharge, suspension or warning notice must be taken within ten days by a written notice.' " *Id.* at 280. The Defendants contended that the Plaintiff had failed to comply with this provision because he had failed to submit written notice, a copy of the appeal, to the compa-

ny. Plaintiff, on the other hand, argued that the agreement only required him to submit a copy of the appeal to the union, and did not also require him to file a copy with the company. *Id.* Rather than making a determination as a matter of law, the trial court submitted the issue to the jury for resolution.

Upon review, the Sixth Circuit stated: "When a contract is ambiguous, it is for the jury to determine the meaning of its terms, subject to proper instructions and based upon 'evidence of the surrounding circumstances and the practical construction of the parties.' " *Id.* The Court, therefore, affirmed the trial Court's ruling because it found that the agreement was "ambiguous as to when the ten-day limit begins to run and whether notice must be sent by the discharged employee to the employer (rather than solely to the union)." *Id.*

■ Although the decision in *Scott* may appear to be inconsistent with the holding in *Alexander*, the Court believes that *Scott* is merely illustrative of the exception to the general rule. Thus, when a contract is clear and unambiguous, its construction is a matter of law to be determined by the Court. On the other hand, where there is ambiguity or uncertainty in the terms of the contract, interpretation of those terms becomes a matter for the jury.

The compatibility of both rules is illustrated in *Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335 (6th Cir. 1975), wherein the appellant relied on *Scott* in support of his position that the trial court erred by failing to submit to the jury the question whether he had been discharged in accord with the terms of the collective bargaining agreement. Under the facts presented, the Sixth Circuit found that the appellant's reliance on *Scott* was misplaced. Unlike the contract language at issue in *Scott*, the Court found the pertinent language in the agreement under scrutiny to be free from ambiguity. The court explained:

> Finding the contract [in Scott] to be ambiguous, the Court submitted the issue of whether there was "just cause" for Scott's discharge to the jury.

Here the language of the contract is unambiguous ... Since the Uniform Rules unambiguously provide for what action the employer may take when an employee is involved in an accident, no issue of "just cause" is presented.

*Id.* at 1338–39. The Court in *Whitten* did not depart from its previous position that the meaning of ambiguous contract terms should be submitted to the jury; it simply recognized and applied the general rule that unambiguous contract terms should be construed by the court as a matter of law.

■ Application of these Sixth Circuit authorities to the case at bar leads the Court to conclude that it properly submitted the question concerning the nature of the contract to the jury. This is not precisely a situation where one or more of the terms of the contract is ambiguous in the sense that the terms, themselves, are susceptible to more than one meaning. Rather, the contract herein contains conflicting provisions which, if standing alone, would probably be clear and unambiguous. The Specifications prepared for the rebuilding of the Banneker Science Building contain a form of contract which is clearly a lump sum type contract (Defendants' Exhibit H). The six page document, captioned, CONTRACT, contains language which is consistent only with a cost plus maximum type contract. *See, e. g.,* Article 9, Government's Exhibit 4. However, the six page document incorporates the Specifications by reference and makes them part of the contract. (*See, Id.,* at 1). Hence, there is a direct conflict between the contract form in the Specifications, and the six page document, captioned, CONTRACT, when the latter document is read in connection with the incorporated document.

Thus, while it may perhaps be somewhat inaccurate to characterize the contract involved in this case as ambiguous, it is, in this Court's opinion, accurate to say that the contract contains conflicting language that is not amenable to a single, clear-cut interpretation. Consequently, in determining who, as between the Court and jury, should resolve the conflict, the authorities

which have considered ambiguous contracts are more analogous to the case at bar than is a case such as *Alexander,* where the term at issue was found to be clear and unambiguous. Under *Scott,* it was within the province of the jury "to determine the meaning of [the contract] terms, subject to proper instructions and based upon 'evidence of the surrounding circumstances and the practical construction of the parties.' " *Scott, supra,* 496 F.2d at 280. In other words, once the Court made the initial determination that the contract was not subject to a single interpretation, or in this case, characterization, it would have been error *not* to have submitted the question regarding the conflict to the jury.

Although such a determination is not required in this case, the Court is also convinced that its decision is entirely consistent with Ohio law. In *Agricultural Industries Ltd. v. Riley Stoker,* 526 F.2d 1174 (6th Cir. 1975) (reversing on other grounds), the Sixth Circuit had occasion to apply Ohio law in a diversity action, where the parties disagreed, in part, over the interpretation of contract language. The Court reached the conclusion that "[a]ccording to Ohio law, it is within the province of the jury, and not for the court, to ascertain and determine the intent and meaning of the contracting parties in their use of uncertain and ambiguous language." *Id.* at 1179. The Sixth Circuit drew support for this conclusion from *Amstutz v. Prudential Insurance Co.,* 136 Ohio St. 404, 26 N.E.2d 454 (1940), a wrongful death action. A question arose therein as to whether an agency relationship existed between the appellant and the person who had been involved in the motorcycle-automobile accident that had resulted in the decedent's death. Resolution of the question turned on the meaning of the word "instructions."

The Ohio court determined that the word "instructions," when read in context, was subject to more than one interpretation. Although not reflected in the court's syllabus, the court stated in the body of the opinion, "While it is the function of a court to construe a contract, it is the province of

the jury to ascertain and determine the meaning and intent of the contracting parties in the use of uncertain and ambiguous language." 136 Ohio St. at 408, 26 N.E.2d 454. Viewed as an exception to the general rule of *Alexander*, the above proposition clearly indicates that Ohio law is consistent with the prevailing Sixth Circuit position, and that this Court properly declined to resolve the conflict herein as a matter of law.

To summarize, based on the aforestated reasons, the Court concludes that, given the conflict in the contract documents introduced at trial, it could not, under the applicable authorities, decide the nature of the contract as a matter of law. Rather, upon proper instruction, it was within the province of the jury to resolve the conflict, and to determine the nature of the obligation undertaken by the parties, and the nature of the obligation upon which the parties proceeded.

The defendants raise an additional, subsidiary argument which must also be addressed briefly prior to assessing the sufficiency of the evidence regarding the nature of the contract. In their joint memorandum, Defendants state, "if the Court could not determine the nature of the contract as a matter of law, ipso facto the jury cannot determine the nature of the contract beyond a reasonable doubt." Doc. # 35, 8–9. They assert that because "the rule of law concerning ambiguity in contracts to juries was developed wholly in civil litigation," it is "inappropriate to criminal cases because of differing burdens of proof." *Id.* at 9.

The Court finds this contention to be utterly without merit. First, there is no inconsistency between the Court's initial determination that a conflict or ambiguity exists on the face of the contract documents, and its decision that the resolution of the conflict or ambiguity is a matter for the jury to determine beyond a reasonable doubt. At no time did this Court rule that it *could not* determine the nature of the contract, in the sense that it was incapable of doing so. Upon examination of the contract documents, the Court made a threshold determination that a conflict existed within those documents, thereby, presenting a genuine dispute as to the nature of the contract. Based on this threshold determination, the Court concluded, consistent with applicable case law, that it was within the province of the jury, and not the Court, to ascertain and determine the meaning and intent of the contracting parties with respect to those conflicting terms, in light of all the evidence presented at trial. In other words, the Court declined to usurp the function of the jury. Certainly, if there had been no written contract, if the agreement had been made orally between the parties, the jury could properly have been given the task of determining the nature of the agreement beyond a reasonable doubt. The Court sees no significant difference between that and the situation presented in the case at bar, once the Court concluded that it was necessary to look beyond the four corners of the contract documents to determine the nature of the agreement between the State of Ohio and the joint venture.

Moreover, even accepting the Defendants' premise that rules governing contract construction have evolved in a civil context, there is nothing inherent in the rules, themselves, or by virtue of their civil pedigree, which precludes their application in a criminal context. It does not follow as a matter of logic that because most contract questions presented to a civil jury need only be resolved by a preponderance of the evidence, a criminal jury will necessarily be rendered incapable of resolving similar contract questions beyond a reasonable doubt. The outcome will turn on the quantum and quality of the relevant evidence. As long as the jury is properly instructed that the government has the burden to prove the nature of the contract as a cost plus maximum, beyond a reasonable doubt, and as long as there is sufficient evidence adduced to meet that burden, the Court perceives no prejudice to the Defendants from having adapted rules that normally operate only in civil cases.

Thus, the final and key question is squarely presented to the Court, namely, whether there was sufficient evidence from which the jury could have determined beyond a reasonable doubt that the contract in question was a cost plus maximum contract.

▮▮▮ The test for determining the sufficiency of the evidence under Rule 29, Fed. R.Crim.P., is well settled in the Sixth Circuit, and was clearly and succinctly stated in *United States v. Conti*, 339 F.2d 10, 13 (6th Cir. 1964):

> In testing the sufficiency of the evidence to withstand a motion for judgment of acquittal, the trial judge does not pass on the credibility of the witnesses or the weight of the evidence. On the contrary, he must view the evidence and the inferences that may justifiably be drawn therefrom in the light most favorable to the Government. If, under such a view of the evidence he concludes that a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion should be overruled and the issue left to the jury. It is only where under such a view of the evidence, he concludes there must be doubt in a reasonable mind, should the motion be granted [citations omitted].

*See also, United States v. May*, 430 F.2d 715, 717 (6th Cir. 1970). Additionally, having denied Defendants' prior motions for acquittal, after which both Defendants presented evidence, this Court must "consider the sufficiency of the evidence on the record as a whole and not the sufficiency of the government's case in chief." *United States v. Black*, 525 F.2d 668, 669 (6th Cir. 1975).

▮▮▮ The Court has re-examined and reconsidered the evidence adduced at trial, in the light most favorable to the government, without weighing it or making any judgments as to witness credibility. Having done so, the Court concludes that its previous rulings, denying Defendants' motion for acquittal, were correct, and that there is sufficient evidence on the record from which reasonable jurors could have determined beyond a reasonable doubt that the contract was a cost plus maximum contract. The discussion which follows will be relatively brief. Essentially, it is a reiteration of the Court's previously articulated reasons for overruling Defendants' motions, and a general summary of the evidence which, in this Court's opinion, supports the government's theory that the contract between the State of Ohio and the joint venture for the rebuilding of the Banneker Science Building was a cost plus maximum contract.

At trial, the government introduced a six page document, captioned, CONTRACT, dated April 2, 1975. (Government's Exhibit 4). This document bears the signatures of the Defendants, the Attorney General, and the Deputy Director of the Department of Administrative Services, Division of Public Works. Article 9 of the document states, in part: "The Contract is based upon a cost plus maximum total cost of $453,800 %y(3)" and the "Contractor shall perform the work on the basis of the 'actual field cost' to the Contractor, and overhead and profit . . . ." This language is clearly consistent with, and supportive of the government's theory that the contract was a cost plus, and that the State of Ohio did not agree to pay the Defendants the total contract price, regardless of their actual costs.

Additionally, Subparts J, K, and L of Article 9 deals with the contractor's obligation to submit costs, the State's right to approve and audit Defendant's costs and records, and the contractor's responsibility to submit sufficiently detailed information for an intelligent review. These provisions tend to indicate that the State of Ohio did not consider the joint venture's costs or documentation thereof to be totally irrelevant, as they would have been under a lump sum contract. On the contrary, they tend to indicate that the State reserved the right to verify or double-check the cost figures submitted to it by the joint venture.

There was evidence that Defendant Leigh inflated some of the partial payment requests submitted to the State, for example, by carrying Bernard Leigh as an active carpenter, and by claiming more equipment

than was actually used on the job. There was evidence that at least one partial payment request reflected inflated billing for xeroxing. There was further evidence that the State reviewed the partial payment requests, and that some items were questioned to the extent that the Defendants agreed to a renegotiation of certain costs or to make a change in their procedure, and that Defendants agreed to a reduction in xeroxing expenses.

Phillip Hughes, Chief of Project Control of the State Architect's Office, testified that he, in effect, told Defendant Leigh that if his costs added up to an amount less than $453,800, the amount in excess of those costs, up to the aforesaid $453,800, would be retained by the State. Carl Bentz, the State Architect at the time of the rebuilding of the Banneker Science Building, testified that his office requested the joint venture to submit a price for Banneker on a cost plus "not to exceed" basis, and that the contract entered into by the State and the joint venture was not a lump sum contract.

Additionally, there was testimony from Joan Plessinger, the bookkeeper at L. B. Robinson, Inc., that Robinson told her that the contract was a time and material contract, and that the billing thereunder would be for costs of material and labor, plus certain percentages of profit. Martha Earl, the bookkeeper at Madden, Inc., at the time, also testified that the Defendants told her that the contract was a time and material contract, and that they would be reimbursed for everything they put into the project, plus their profit and overhead.

Martha Earl also testified that she and Defendants had a conversation in the Spring of 1975, in Defendant Leigh's office, during which the Defendants indicated to her that their costs estimates on the Benneker Science Building were going to fall below the amount allowed under the contract. She testified further that she and Defendants discussed methods of getting "the rest of the money out" of the contract.

Other evidence supportive of the government's theory that the contract was a cost plus maximum include: the Joint Venture Agreement, which states on its face that the agreement extended only to time and materials contracts for the rehabilitation of the buildings of Central State University (Government's Exhibit # 3, # 1, at 1); and the testimony of George Lord that, in his opinion, the contract was a cost plus maximum.

The above overview of the evidence is not intended to be exhaustive. It does, however, tend to indicate that the State of Ohio did not treat this contract as one of a lump sum variety. The evidence regarding the statements and actions of the Defendants, in connection with the contract, also tends to indicate that the Defendants, likewise, did not treat the contract as a lump sum. Viewed from the perspective set forth by the Sixth Circuit in *United States v. Conti, supra,* 339 F.2d at 13, it is this Court's opinion that reasonable minds could have fairly concluded beyond a reasonable doubt, from the evidence on the record, that the contract between the State of Ohio and the joint venture was a cost plus maximum contract. The Court, therefore, overrules, in its entirety, that branch of the Defendants' motion for acquittal directed to the sufficiency of the evidence from which the jury could have properly concluded beyond a reasonable doubt that the contract in question was a cost plus maximum contract.

*II. Variance: Checks v. Warrants*

In each of the substantive mail fraud counts of the indictment, Defendants are alleged, on or about a certain date, to have "knowingly caused to be delivered by the United States Postal Service, according to the directions thereon, a check in an envelope addressed to Madden, Inc.—L. B. Robinson, Inc. at 2305 Heartsole Avenue, Dayton, Ohio, 45408." (Counts II–VIII). At trial, the government called Mr. Henry Shomber of the State Auditor's Office. During direct examination, Mr. Shomber was questioned regarding Government's Exhibit 48, which consisted primarily of copies of nine documents, Draws # 1–9. Mr. Shomber testified that these documents, which were later introduced into

evidence, were "warrants," which are promissory notes, and not "checks." The government made no attempt to correct Mr. Shomber's characterization of the documents; presented no further evidence tending to show that "checks" had been mailed by the State to the joint venture; and did not seek to amend the wording of the indictment from "checks" to "warrants."

Because the government failed to prove that "checks" had been mailed to the joint venture, as alleged in each of the substantive mail fraud counts, the Defendants have moved for judgment of acquittal on Counts II–VIII. They claim that Mr. Shomber's uncontroverted testimony that the items were "warrants," as opposed to "checks," constitutes a fatal variance, and that the government, therefore, failed to prove an essential element of the mail fraud statute, 18 U.S.C. § 1341.

■ The Court has considered the Defendants' arguments, and finds them to be without merit. In assessing the impact of a variance between proof and an indictment, "[t]he true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). In the Sixth Circuit, "[a] variance is not to be regarded as material where it is not of a character which could have misled the defendant at trial, or where it involves no element of surprise prejudicial to the efforts of the defendant to prepare his defense, or where it does not affect substantial rights." *United States v. Mills,* 366 F.2d 512, 514 (6th Cir. 1966) (citations omitted). *See also, United States v. Fruehauf Corp.,* 577 F.2d 1038 (6th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). In other words, a legally significant variance is one which "occurs when the proof introduced at trial differs *materially* from the facts alleged in the indictment." *United States v. Beeler,* 587 F.2d 340, 342 (6th Cir. 1978) (emphasis added); *see also, Watson v. Jago,* 558 F.2d 330, 334 (6th Cir. 1977).

■ Obviously, the indictment returned against the Defendants would have been more accurate had the word, "warrant," appeared each and every time the word, "checks," was used. However, under the applicable authorities, the Court concludes that the precise character of the items that were mailed by the State to the joint venture was not an essential element of the government's proof. The Court further concludes that there was sufficient evidence from which the jury could have determined beyond a reasonable doubt that certain, specific documents, copies of which were introduced at trial, were mailed to the joint venture in furtherance of the scheme alleged in Counts II–VIII of the indictment, and, therefore, the variance which occurred between the proof and the indictment was not a material and prejudicial one.

Defendants neither claim nor demonstrate that they were surprised or misled, or that the preparation of their defense was impaired because Mr. Shomber characterized the documents about which he testified, *e. g.,* Government's Exhibit 48, as "warrants," rather than "checks." They do not claim nor is there any genuine risk that the variance would pose a threat of double jeopardy. *See, Berger, supra,* 295 U.S. at 82, 55 S.Ct. at 630; *United States v. Izzi,* 613 F.2d 1205 (1st Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980).

Nor have the Defendants shown that any other of their substantial rights were affected by virtue of this variance. They do not deny, as a general proposition, that warrants were mailed. They do not deny that the documents contained in Government's Exhibit 48 are exact reproductions of the actual documents issued and mailed by the State of Ohio to the joint venture, in connection with the rebuilding of the Banneker Science Building. Their sole complaint is that when questioned about these particular documents, the existence and mailing of which were uncontroverted, Mr. Shomber testified that said documents were "warrants," and not "checks." The Court does not agree with the Defendants' under-

lying premise that it was incumbent upon the government to prove the precise nature of these documents.

▮ Under the mail fraud statute, 18 U.S.C. § 1341, the government must prove two elements beyond a reasonable doubt: "(1) a scheme to defraud and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *United States v. Hopkins*, 357 F.2d 14, 16 (6th Cir.) *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The Court has previously determined that there was sufficient evidence from which the jury could have determined beyond a reasonable doubt that the Defendants devised a scheme to defraud the State of Ohio. The question which Defendants have raised is whether the government has satisfied the second essential element of the offense.

▮ Despite Defendants' assertions to the contrary, the Court is satisfied that the government presented sufficient evidence to meet its burden with respect to the second essential element. In *United States v. Hopkins*, 357 F.2d 14, 17 (6th Cir.) *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966), the Sixth Circuit was asked to reverse a mail fraud conviction on the ground that no proof had been presented as to the letter which had been mailed or the tenor thereof. Neither the letter nor any specific testimony regarding its contents was adduced at trial. The court affirmed the conviction, stating, "*[T]he contents of the mailing are not controlling*, so long as it is clear that the use of the mails was in furtherance of the fraudulent scheme ... Proof as to the specifics of the letter ... is ... not essential." *Id.* (emphasis added). In other words, in order to satisfy the second essential element of the mail fraud statute, the government must prove *the fact of the mailing*; it is not essential to prove the type, contents or character of the items that are mailed.

Applied to the case at bar, it appears to the Court that there was clearly sufficient evidence presented to prove that certain, specific documents were mailed by the State of Ohio to the joint venture, in connection with the Banneker Science project. Mr. Shomber testified that the nine documents in Government's Exhibit 48 were exact reproductions of the documents actually issued and mailed by the State. Additionally, these copies were introduced at trial, and thus, were before the jury during its deliberations. Further, Defendants have neither attempted to controvert nor to deny the fact that the mails were used to transmit these documents. Given the evidence presented, all of which tends to support the government's theory that several mailings, corresponding with Counts II–VIII of the indictment, had occurred, the fact established by Mr. Shomber's testimony that the contents of the mailings were "warrants," as opposed to "checks," is not, in this Court's opinion, materially different from the facts alleged in the indictment. Therefore, based on the foregoing, the Court overrules that branch of the Defendants' motion which is predicated on the variance between the proof and the indictment, with respect to the character of the items issued and mailed by the State of Ohio to the joint venture.

### III. Variance: Termination Date of the Conspiracy

Finally, the Defendants have also jointly moved for judgment of acquittal as to the conspiracy count of the indictment, Count I, on the ground that there was no evidence from which the jury could have found that the conspiracy continued in existence until March 13, 1980. In support, Defendants argue that it is clear from the indictment that the purposes of the conspiracy were limited to the reconstruction of the Banneker Science Building, and that, under the evidence, the latest date on which there could have been conspiratorial activity relative to that project was when the last warrant was mailed, that is, mid-summer of 1976. Additionally, Defendants claim that the government, at least tacitly, admitted to a termination date prior to March 13, 1980. Finally, Defendants also point out that the Court instructed the jury that an

essential element of the conspiracy offense was that the conspiracy continued in existence until March 13, 1980. Basically, Defendants have claimed an additional fatal variance between the proof and the indictment, dealing with a disparity as to the termination date of the conspiracy which is the subject of Count I.

 Assessing this claimed fatal variance under the principles announced in *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935), as interpreted by the Sixth Circuit in *United States v. Mills*, 366 F.2d 512, 514 (6th Cir. 1966), the Court finds Defendants' contention to be without merit. "A variance between the date alleged in the indictment and the date of the commission of the offense as shown by the evidence is generally not fatal." *United States v. Harmon*, 486 F.2d 363, 366 (10th Cir.), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1568, 39 L.Ed.2d 876 (1973). "Unless the indictment is brought under a statute intended to have such an effect, the exact time of the commission of the crime is not a substantive element of the proof." *United States v. Antonelli*, 439 F.2d 1068, 1070 (1st Cir. 1971).

In the case at bar, Defendants have failed to demonstrate that this variance affected any of their substantial rights. They do not claim that they were misled or surprised by the variance, or that the preparation of their defense was, in any way, impaired. Clearly, there is no genuine threat of double jeopardy arising from this variance.

Additionally, although the Court acknowledges that it instructed the jury that one of the essential elements of the conspiracy count was "that the conspiracy described was willfully formed and was in existence from on or about April 7, 1975, up to and including March 13, 1980," (Jury Instructions, at 3007), it must also be noted that the Court instructed the jury, without objection from the Defendants, that it was not necessary for the government to prove beyond a reasonable doubt that the acts alleged were committed on the exact dates named in the indictment (Jury Instructions, at 1016). Given their failure to object to

the instruction that the government need not prove the exact dates in the indictment beyond a reasonable doubt, the Court does not believe that the Defendants can, at this late date, be heard to complain about any contradiction which may have been presented by these instructions.

A review of the record indicates that there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the conspiracy alleged in Count I continued in existence from on or about April 7, 1975, until approximately mid-summer of 1976, when the last warrant was mailed by the State of Ohio to the joint venture. Because the Court perceives no prejudice flowing to the Defendants, arising out of the disparity between the termination date set forth in the indictment, and the approximate termination date indicated by the evidence, Defendants' motion for judgment of acquittal, predicated on this variance, is overruled.

### IV. Additional Matters Raised Solely by Defendant Leigh: Extrajudicial Statement of Co-defendant; Exclusion of Blacks From Jury

In a Supplemental Memorandum, filed on August 11, 1980, Defendant Leigh raised two additional contentions in support of his post-trial motions. The first concerns an extrajudicial statement made by Defendant Robinson to an FBI agent, about which the agent testified at trial. The second concerns the government's use of peremptory challenges to excuse prospective black jurors from the jury. For the reasons set forth below, the Court finds both of these contentions to be without merit.

### A. Extrajudicial Statement of Robinson to Special Agent Ryan

At trial, FBI Special Agent Ryan testified that in April, 1980, Defendant Robinson stated to him in essence that the contract for the Banneker Science Building was a cost plus maximum contract. Specifically, Ryan testified:

We then discussed the type of contract that was awarded to the joint venture on the Banneker Science Building. Mr. Rob-

inson said this contract was awarded without a bid. He stated that at first he was not too happy with the percentage of profit that were [sic] offered in the initial contract. Mr. Robinson said that he talked to Carl Bentz, the State Architect at that time, and expressed an opinion that the percentage of profit and overhead was not high enough. As a matter of fact, Mr. Robinson said that he probably would have withdrawn from the joint venture on this particular job ... had not the profit percentage been increased, Mr. Bentz agreed to increase the profit percentage ....

We further discussed the contract. And Mr. Robinson said the contract on the Banneker Science Building was a contract where an amount was set, and if the joint venture's costs exceeded this amount the State of Ohio would only pay the amount of the contract. He also said that if the actual costs of construction incurred by the joint venture were less than the original contract amount, the State would only pay the lesser of the amount over the actual cost.

Transcript, Excerpt of Direct Examination of Agent John Ryan, at 4. Counsel for Defendant Leigh raised no objection to this testimony at the time it was given.

After charging the jury, the Court called a bench conference, during which all counsel were asked if they had any objections to the charge. In addition to the Defendants' joint objection to Alternative # 1, counsel for Leigh brought to the Court's attention for the first time that the portion of Ryan's testimony quoted above was inadmissible hearsay as against Leigh, because the statement was not made in the course of and in furtherance of the conspiracy. *See,* Rule 801(d)(2)(E), Fed.R.Evid. For this reason, counsel requested the Court to supplement its instructions by admonishing the jury to consider the statements of Robinson only against him, and not against Leigh. Having previously instructed the jury to consider the evidence adduced against each Defendant separately, and to make separate findings of guilt or innocence with respect

to each Defendant, the Court declined to give the requested limiting instruction.

Defendant Leigh contends Ryan's testimony about statements made to him by Robinson violated the rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and that the error was perpetuated by the Court's failure to give a limiting instruction. The Court, however, is of the opinion that Leigh's reliance on *Bruton* and its progeny is misplaced.

In *Bruton,* the Court held that the confrontation clause of the Sixth Amendment is violated when a certain kind of extrajudicial statement of a co-defendant, who does not take the stand, is placed before a jury at a joint trial, and that a limiting instruction is an inadequate substitute for a Defendant's right of cross-examination. 391 U.S. at 137, 88 S.Ct. at 1628. *See also, Nelson v. O'Neil,* 402 U.S. 622, 626, 91 S.Ct. 1723, 1725, 29 L.Ed.2d 222 (1971); *United States v. Lyon,* 397 F.2d 505 (7th Cir. 1969). The *Bruton* rule is not, however, automatically triggered whenever a co-defendant's extrajudicial statements are admitted into evidence. The substance of the statement is the key factor in determining whether the complaining Defendant's Sixth Amendment rights have been violated. The rule only applies when the substance of the admitted statement in some way inculpates the defendants against whom it constitutes hearsay evidence. *See, e. g., Bruton v. United States, supra,* 391 U.S. at 124, 88 S.Ct. at 1621 (co-defendant's confession to postal inspector that he and petitioner committed armed postal robbery); *United States v. Holt,* 483 F.2d 76 (5th Cir. 1973) (co-defendant-father's statements inculpated appellant-son); *United States v. Morales,* 477 F.2d 1309, 1314–15 (5th Cir. 1973) (co-defendant's statements expressly inculpated appellant); and *United States v. Truslow,* 530 F.2d 257 (4th Cir. 1975) (government witness testified about conversation with co-defendant in which appellant was inculpated).

If the extrajudicial statement does not inculpate the defendant, then the rights which the *Bruton* rule is designed to protect are not violated. This is illustrated in *United States v. Lyon*, 397 F.2d 505 (7th Cir. 1968), where the Court rejected one appellant's *Bruton* claim but agreed that the *Bruton* rule had been violated with respect to the other appellant. The appellants, Lyons and Lysczk, were convicted of conspiracy, and traveling and using facilities in interstate commerce for the purpose of prostitution. On appeal, both claimed that the trial court's denial of pre-trial motions for severance and its admission into evidence of certain extrajudicial admissions violated the rule in *Bruton*. The statements under attack were made by appellants after the terminal date of the conspiracy and introduced in evidence by the testimony of an FBI agent. Neither of the appellants testified at trial.

Concluding that "Lyon's admissions did not implicate Lysczk," the Court affirmed Lysczk's conviction because "his right of confrontation clearly was not violated." *Id.* at 509. The Court did, however, find a violation of *Bruton* with respect to Lyons and reversed her conviction. The distinguishing factor between the two was that "Lysczk's admission implicated Lyons as his partner in the prostitution enterprise." *Id.* at 510. Consequently, the Court held, "[t]he introduction of his [Lysczk's] extrajudicial admissions at this joint trial violated Lyon's Sixth Amendment right of confrontation and that violation could not be corrected by an instruction." *Id.*

■ Leigh's *Bruton* argument fails for the same reason given for rejecting Lysczk's argument in *Lyon*. Ryan's testimony about statements made to him by Defendant Robinson did not inculpate Leigh. There is no reference to Leigh in the context of the quoted testimony. Consequently, the challenged testimony does not fall within the ambit of the *Bruton* rule and resulted in no violation of Leigh's Sixth Amendment rights of confrontation. Thus,

the Court's refusal to give the requested limiting instruction was not error.

The situation in the case at bar is more akin to those cases in which extrajudicial declarations of a co-defendant have been admitted, but the declarations do not link the complaining defendant with the criminal conduct of which he is accused. In such cases, the Courts have uniformly upheld the convictions, despite the admission of the hearsay testimony.

For example, in *United States v. Johnson*, 467 F.2d 804 (1st Cir. 1972), the appellants asserted error because the trial court admitted certain hearsay declarations against the appellants, and did not, thereafter give a limiting instruction. In summary fashion, the Court stated:

> Little need to said with regard to the admission of Marchitello's conversation with the Campbell without limiting instructions because this evidence could not possibly have been prejudicial to Johnson. The latter was neither mentioned or referred to in any manner in this conversation, nor did he raise any objection to the admission of this testimony at trial.

*Id.* at 807.

Similarly, in *United States v. Bailleul*, 553 F.2d 731 (1st Cir. 1977), several co-defendants were convicted on substantive counts of operating a professional gambling ring. The evidence at trial consisted primarily of tape recordings of phone conversations between the co-defendants and other, uncharged, individuals. The co-defendants, who were convicted on the substantive counts, contended on appeal that it was plain error for the trial court not to have given, *sua sponte*, a limiting instruction as to the extrajudicial declarations to which they were not parties.

At the outset, the Court pointed out that "[p]rior to the playing of the tapes for the jury, no limiting instructions were either requested by counsel or given by the Court." *Id.* at 733. The Court also noted that the appellants did not claim that "the taped conversations to which they were not parties referred to them in any way." *Id.*

The Court, therefore, concluded that "[t]his evidence could not possibly have been prejudicial because these appellants were 'neither mentioned nor referred to in any manner' in the conversations to which they were not a party." *Id., quoting, United States v. Johnson, supra.*

Finally, in *United States v. Rizzo,* 418 F.2d 71 (7th Cir. 1969), *cert. denied,* 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970), several co-defendants objected to the introduction of an FBI agent's testimony regarding conversations he had with another of the co-defendants. The co-defendant who made the statements moved the trial court to suppress these statements on grounds of specific *Miranda* violations. The trial judge overruled the motion.

On appeal, the co-defendant raised an additional *Miranda* argument, which the Court found to be meritorious, but untimely, because it had not been raised at trial. *Id.* at 78. The court was unpersuaded by the argument of the other co-defendants that the admission of the extrajudicial declarations was prejudicial to them. The Court stated:

> Elia's statement did not tend to inculpate [the other defendants], or in any manner connect them with, or impute to them knowledge [of the house of prostitution referred to by Elia] ... [T]he erroneous admission of a post-conspiratorial statement did not directly inculpate the co-conspirator and the record contained substantial independent evidence of the entire conspiracy.

*Id.* at 79.

Relying on the foregoing authorities, the Court concludes that the admission of Ryan's testimony regarding the conversation he had with Robinson did not prejudice Leigh. As is clear from the quoted portion of Ryan's testimony, Robinson's declarations did not inculpate Leigh or specifically mention or refer to him in any way. Because counsel for Leigh lodged no objection to this testimony when it was given, and because, by the time an objection was made, the Court had already instructed the jury to consider the evidence adduced against each defendant separately, the Court also concludes that it committed no error in declining to give a further limiting instruction.

### B. Government's Use of Peremptory Challenges to Excuse Prospective Black Jurors

Defendant also challenges the government's use of peremptory challenges to excuse blacks from the jury in this case. He argues, "Whatever the case law may be with respect to the technical legal propriety of such conduct ... it does not further the interest of justice. Arguably, William Leigh was denied a trial by his peers." Supplemental Memorandum, at 4.

The principles which govern this question are derived from *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), wherein the Supreme Court affirmed the rape conviction of the petitioner, who was black. Petitioner had moved to quash the indictment, to strike the trial jury venire, and to declare void the petit jury chosen in the case, on grounds of invidious discrimination. *Id.* at 203, 85 S.Ct. at 826.

The Court stated, as a general proposition, that "a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which the petit jurors are drawn." *Id.* at 208, 85 S.Ct. at 829. Later in the opinion, the Court discussed some of the differences between peremptory challenges and challenges for cause:

> The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable... It is no less frequently exer-

cised on grounds normally thought irrelevant to the legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliation of people summoned for jury duty.

*Id.* at 220, 85 S.Ct. at 835 (citations and footnote omitted).

The Court concluded:

In light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the Court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all negroes were removed from the jury or that they were removed because they were Negroes.

*Id.* at 222, 85 S.Ct. at 837. *See also, United States v. Newman,* 549 F.2d 240 (2d Cir. 1977); *United States v. Carter,* 528 F.2d 844 (8th Cir. 1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206; *United States v. Pearson,* 448 F.2d 1207 (5th Cir. 1971).

▮ Based on the principles announced by the Court in *Swain,* it is clear that Leigh has offered no legally cognizable ground which warrants judgment of acquittal or new trial on the basis of the government's use of its peremptory challenges. The contentions raised do not serve to rebut the presumption that the government used its challenges for the purpose of obtaining a fair and impartial jury. There is nothing in the record, nor does Leigh offer any evidence that would indicate that the government acted improperly. Having failed to rebut the presumption of propriety on the part of the government in exercising its peremptory challenges, the Court concludes that the composition of the jury did not deny Leigh a fair trial.

*V. Correction of Entry and Decision of May 11, 1980.*

The final sentence of the second full paragraph on page 4 of the Court's May 11, 1981, Entry reads as follows:

Thus, under the defendants' theory of the case, acquittal was mandated if the jury found beyond a reasonable doubt that the contract was lump sum for the reason that they could not possibly have received more money than they were entitled to receive, and, therefore, could not possibly have defrauded the State of Ohio, under the scheme alleged.

Having re-read this sentence, the Court believes that it inadvertently creates the impression that the Defendants had the burden of proving beyond a reasonable doubt that the contract was a lump sum. Defendants, of course, had no such burden in this case. Rather, under the indictment, the burden was upon the government to prove beyond a reasonable doubt that the contract between the State of Ohio and the joint venture was a cost plus maximum contract.

Therefore, to avoid confusion, and for the sake of dispelling a potentially false impression, the following sentence should be substituted for the sentence quoted above, from the Court's May 11, 1981, Entry:

Thus, under the defendants' theory of the case, acquittal was mandated if the jury failed to find beyond a reasonable doubt that the contract was a cost plus maximum contract, because only under a cost plus maximum contract could the defendants have possibly received more money than they were entitled to receive, and thus, to have defrauded the State of Ohio, under the scheme alleged.