**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Louis HEIMANN, Defendant-Appellee.**

**No. 512, Docket 82–1272.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1982.
Decided April 14, 1983.

Warren Neil Eggleston, Asst. U.S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Walter P. Laughlin, Asst. U.S. Atty., New York City, on the brief), for plaintiff-appellant.

Alan R. Kaufman, New York City (Buchwald & Kaufman, New York City, of counsel), for defendant-appellee.

Before VAN GRAAFEILAND, MESKILL and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The United States appeals from an order of the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge,* granting defendant Louis Heimann's motion under Fed.R.Cr.P. 29(c) to set aside the jury's verdicts and to enter a judgment of acquittal on each of the nine counts on which defendant was found guilty. The motion was made on the ground that there had been a prejudicial variance between the charges in the indictment and the proof at trial.

After a two week trial on a seventeen count indictment, the jury convicted Heimann on five counts of mail fraud, 18 U.S.C. § 1341 (1976), two counts of wire fraud, 18 U.S.C. § 1343 (1976), and two counts of foreign transportation of goods obtained by fraud, 18 U.S.C. § 2314 (1976). Heimann's wife, who was also charged in the indictment, was acquitted on all counts.

The district judge granted Heimann's Rule 29(c) motion in an unreported opinion dated June 28, 1982. Construing the indictment as charging Heimann with a fraudulent scheme that began in January 1978, the district judge interpreted the government's trial presentation as having abandoned any claim of fraud prior to the seven months beginning in June 1980. Because of the time disparity that he perceived in the scope of the frauds alleged and proved, he determined that there was a variance that "was prejudicial to defendant's right to a fair trial." He concluded: "Therefore the conviction is reversed as to all counts."

Although no formal judgment of acquittal was signed by the district judge, the clerk of the district court, and apparently the parties as well, have interpreted Judge Sweet's opinion and order as a direction for a judgment of acquittal. The docket sheet reads "Deft. acquitted by the court's opinion of 6–28–82", and neither party has questioned the accuracy of that entry. On this appeal the government has focused on the merits of the variance issue and has not claimed alternatively that instead of acquittal, the court should have ordered a new trial, which ordinarily would be the remedy for an unfair trial. Without approving the procedures followed, we accept the parties' interpretation of the proceedings below as a setting aside of the jury's verdicts of guilty and an entry of judgment of acquittal on counts 2, 3, 4, 5 and 6 (mail fraud), 8 and 9 (wire fraud), and 16 and 17 (transportation in foreign commerce of goods obtained by fraud). We do not consider whether a new trial would have been permissible or required.

On the central issue we reject the district court's finding of a prejudicial variance and conclude that the government's proof at trial substantially conformed to the allegations of the indictment. We also conclude that defendant was not prejudiced by any uncertainty as to when his own fraudulent intent was formed. Accordingly, we reverse and reinstate the jury's verdicts on all nine counts and remand the case to the district court for sentencing. We note in passing that since the reasoning of the dis-

trict court, even if valid, would not support a judgment of acquittal on the two transportation counts, which did not require proof of a fraudulent scheme of any particular length, those convictions would have to be reinstated in any event.

## BACKGROUND

The indictment charged that beginning in or around January 1978 and continuing until the indictment was filed in December 1981, defendant Heimann and his wife devised and executed a scheme to defraud a small group of antique jewelry merchants, auction houses and banks out of substantial sums of money and precious objects. The indictment identified Jan Skala and Isi Fischzang, two merchants who operated shops on West 47th Street in Manhattan, as the Heimanns' principal victims. It alleged that throughout 1979 and 1980, the Heimanns obtained valuable merchandise from Skala and Fischzang, initially by outright purchase, but eventually "on memorandum", a customary transaction in the jewelry business in which the buyer is entrusted with merchandise and agrees either to pay for it or to return it by a certain date.

The Heimanns allegedly transported the merchandise they obtained "on memorandum" to several Swiss auction houses, represented that they had full ownership rights, and then entered into consignment arrangements pursuant to which they received significant cash advances to be charged against the anticipated auction proceeds. These advances were obtained either directly from the auction houses or indirectly through a number of Swiss and American banks.

The indictment further charged that to effectuate the scheme the Heimanns made substantial payments to the merchants until the summer of 1980, during which time the level and frequency of their dealings escalated. Thereafter, they allegedly consummated the fraud by obtaining approximately $3.8 million in merchandise "on memorandum" for which no substantial payments were ever made. The indictment also alleged that the Heimanns attempted to lull the merchants into a false sense of security throughout the fall and winter of 1980 by making numerous false promises that payment would be forthcoming.

In substance the fraudulent scheme charged was that the Heimanns carefully cultivated their relationships with Skala and Fischzang throughout 1979 and early 1980 in order to earn their trust and then in the latter part of 1980 swindled them out of approximately $3.8 million. Insofar as the early transactions were necessary to induce the merchants to later part with more valuable property without security, they were a critically important component of the scheme.

It is beyond dispute that the actual evidence introduced by the government at trial substantially supported these allegations. With one exception, the government proved each of the pre-June 1980 transactions in great detail, placing particular emphasis on Louis Heimann's deceitful conduct during that period. For example, the government introduced evidence to show that Heimann repeatedly misrepresented to Skala and Fischzang as early as the fall of 1979 that he had wealthy, private buyers for the merchandise he was obtaining "on memorandum"; that Heimann lied to Skala when he represented that he owned the luxurious Park Avenue apartment where merchandise was often exchanged; and that Heimann lied to both Skala and Fischzang in the spring of 1980 when he claimed that his failure to make timely payments was due to bookkeeping errors by his nonexistent partner. In sum, the government sought at trial to establish a pattern of false and deceitful conduct that characterized the pre-June 1980 transactions. This evidence was suggestive of Heimann's intent and was entirely consistent with a charge that Heimann had schemed to defraud from the outset of his dealings with Skala and Fischzang.

The defense also focused on the early transactions, attempting to show that the surrounding circumstances were inconsistent with the government's theory that Heimann had embarked on a preconceived

scheme to defraud the merchants. The defense therefore emphasized that Heimann not only made substantial payments up to June 1980, but that he was consistently late in making those payments, a course of dealing that was not likely to inspire the merchants' confidence. As further evidence of Heimann's innocent state of mind, the defense sought to prove that Heimann, a foreigner who did not understand English, could reasonably have regarded the transactions in question not as "memorandum" arrangements, but as credit sales which would have lawfully entitled him to consign the merchandise to the auction houses. All of this evidence raised an issue of fact for the jury as to whether Heimann had devised a scheme to defraud; but the jury rejected defendant's arguments and accepted the inference of fraud urged by the government, at least with respect to the transactions underlying counts 2, 3, 4, 5, 6, 8 and 9.

The thrust of Heimann's Rule 29 motion was not directed at the actual evidence that was introduced at trial, but instead at some remarks the prosecutor made in his opening statement and closing argument. At the very beginning of his opening, the prosecutor explained:

> [This case] is about a scheme to defraud two jewelry merchants on 47th Street out of millions of dollars worth of jewelry and precious objects *over a seven month period in the last part of 1980.* (emphasis added)

In his summation, the prosecutor stated: It is not the government's contention in January of 1979, when Louis Heimann walked into Jan Skala's shop that at that time he had formulated a specific perfectly laid out plan and scheme to obtain jewelry some time later. That's not the government's intention or contention. Not then.

And later, in his rebuttal summation, the prosecutor observed that:

> In almost all of [defense counsel's] summation it was directed at two things. First it was directed at an area before there was any controversy.

We [sic: "He"] talked a lot about the June 1979 transactions, and the transactions through March of 1980. There wasn't any controversy about any of those. The government says those were paid.

Defense counsel say they are paid. So what? That's what he spent about half his time on.

The district judge relied exclusively on the first and third of these excerpts in concluding that at trial the government had modified its theory of the indictment. He also concluded, without any discussion whatsoever, that prejudice to the defendant from the prosecutor's remarks was "obvious" and "substantial".

On appeal, the government argues that in determining that there was a variance Judge Sweet disregarded the proof at trial as well as the bulk of the prosecutor's opening and summation. The government also contends that even if there were a variance, defendant suffered no prejudice. Heimann, on the other hand, claims not only that his convictions were the product of a prejudicial variance, but that they were also the result of an impermissible amendment of the indictment.

## DISCUSSION

### A. *Amendment of Indictment*

■ We find no merit in defendant's claim that the effect of the prosecution's argument at trial was to amend the indictment with the result that the convictions are invalid without regard to whether defendant was prejudiced by any difference between the indictment and the proof. Clearly, there was no change in the language of the indictment by order of the court such as was prohibited in *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), where the trial court had expressly ordered deleted from the indictment one of the parties alleged to have been deceived by defendants' conduct. Nor do we have a "constructive amendment" of the indictment as in *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960),

where on an indictment charging that the defendant had interfered with interstate commerce in importing sand, the trial court instructed the jury that they could find defendant guilty if he had interfered with interstate commerce in exporting steel. Noting that "the right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment", 361 U.S. at 219, 80 S.Ct. at 274, the Supreme Court in *Stirone* held that under the Hobbs Act "when only one particular kind of commerce is charged to have been burdened, a conviction must rest on that charge and not another." *Id.* at 218, 80 S.Ct. at 273.

In Heimann's case, however, there was no amendment of the indictment, either express or constructive. The participants and victims of the fraudulent scheme that was proved were the same as those in the one alleged. Identical, too, were the subject of the scheme (transactions in jewelry and precious objects) and the nature of the scheme (to obtain jewelry on memorandum and then sell it through auction houses or use it as collateral for loans). The only "amendment" claimed is the time when the defendant's dealings with his victims first became fraudulent, but in his charge the district judge did not focus specifically on the time of the scheme; he merely charged that the government had to prove that the scheme "existed at or about the time charged in the indictment". *Cf. Stirone v. United States, supra.* In short, there is nothing in the record to support defendant's claim that the indictment was amended.

### B. *Variance of Proof*

We turn next to the question of whether there was a variance as found by the district court. Because proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the "core of criminality" to be proven at trial. *United States v. Sindona,* 636 F.2d 792, 797–98 (2d

Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981) (indictment charged defendant with concealing the fact that certain funds had been fraudulently obtained; proof established that defendant concealed only the source of the funds); *United States v. Knuckles,* 581 F.2d 305, 308–12 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978) (indictment charged distribution of heroin; jury properly instructed that it could find defendant guilty if the narcotics were either heroin or cocaine); *see also United States v. DiFrancesco,* 604 F.2d 769 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Brozyna,* 571 F.2d 742 (2d Cir.1978).

Particularly with respect to allegations of time, we have permitted proof to vary from the indictment provided that the proof fell within the period charged. In *United States v. Postma,* 242 F.2d 488 (2d Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1381, 1 L.Ed.2d 1436 (1957), this court considered on reargument a contention similar to that rejected here, explaining, "it is true we did not discuss this contention in our original decision: we thought it too specious to need discussion." 242 F.2d at 496. In that case although a conspiracy was alleged to have begun on or about June 1951, the proof showed that it did not begin until November 1952. Despite the failure to prove the conspiracy for the full period alleged, this court held, "It does not follow that there was a fatal variance: the conspiracy proved fell within the period charged." *Id.* at 497; *see also United States v. Lamont,* 565 F.2d 212, 223 n. 23 (2d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *United States v. Houlihan,* 332 F.2d 8, 14 (2d Cir.), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964); *United States v. Tramaglino,* 197 F.2d 928, 932 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952). Other courts have been similarly relaxed about the effect of time allegations. *See, e.g., United States v. Davis,* 679 F.2d 845, 852 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1198, 75 L.Ed.2d 441

(1983); *Arnold v. United States,* 336 F.2d 347 (9th Cir.1964), *cert. denied,* 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965); *United States v. Krepper,* 159 F.2d 958, 964 (3d Cir.1946), *cert. denied,* 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947); *United States v. Leigh,* 515 F.Supp. 405, 422–23 (S.D.Ohio 1981). We see no reason to alter this approach here. Since the fraudulent scheme that the government proved against Heimann fell within the period charged in the indictment, we conclude that there was no fatal variance.

■ The district court's contrary view was based on the prosecutor's remarks to the jury. We think such reliance was misplaced. To begin with, in determining whether to vacate a conviction due to a variance, the relevant inquiry is whether "the *evidence* adduced at trial establishe[d] facts different from those alleged in an indictment", *Dunn v. United States,* 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979) (emphasis added); *see United States v. Brozyna, supra,* and an advocate's arguments to a jury surely do not qualify as "evidence".

Moreover, when read in context, *see United States v. Coven,* 662 F.2d 162, 172 (2d Cir.1981), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982), the prosecutorial comments that Heimann points to as particularly strong indicators of the "variance" do not reflect any intention on the part of the government to narrow the fraud charged in the indictment. According to defendant, the prosecutor's explanation in his opening statement that the case was "about a scheme to defraud two jewelry merchants on 47th Street out of millions of dollars worth of jewelry and precious objects over a seven month period in the last part of 1980" suggests that the government was urging at trial that the scheme to defraud was limited to the seven month period rather than the much longer period charged in the indictment. Defendant ignores, however, the next two sentences uttered by the prosecutor: "And it is about more than that. It is about a web of lies and falsehoods and deceit committed by the two people, the two schemers, in order to make that scheme work."

Defendant also ignores the remainder of the opening statement, in which the prosecutor continued his narrative, describing the transactions in 1979 and early 1980 that "substantially went okay". The dollar amounts were "not too great". Although payments were late, the payments were made. "But then with that history behind them", the prosecutor emphasized, "in June of 1980 started a flow of millions of dollars worth of jewels and precious objects from Skala and from Fischzang to the two defendants, all on memorandum." This was both a fair characterization of the indictment and an accurate prediction of the proof to come.

These opening remarks did not suggest a government position that Heimann did not turn fraudulent until the last part of 1980; they merely expressed the prosecutor's expectation that evidence would show it was during the last months of the period covered by the indictment that the merchants actually suffered a loss. Indeed, the opening remark that Heimann emphasizes, almost exactly paralleled paragraph 6 of the indictment, which charged that "[after mid-1980] * * * defendants defrauded the two merchants out of approximately $3,000,-000." When placed in perspective, therefore, these remarks cannot fairly be viewed as an abandonment of the allegation that the scheme began much earlier in the transactions between the defendant and his merchant victims, particularly since the remainder of the opening statement, not to mention the bulk of the evidence introduced at trial, closely tracked the indictment.

The second instance relied upon by defendant to support his variance claim is the statement by the prosecutor in his summation that:

It is not the government's contention in January of 1979, when Louis Heimann walked into Jan Skala's shop that at that time he had formulated a specific perfectly laid out plan and scheme to obtain jewelry sometime later. That's not the government's intention or contention. Not then.

Like the portion of the opening statement discussed above, this comment by the prosecutor, when viewed in context, cannot fairly be viewed as an abandonment of the allegations of the indictment, for immediately following it the prosecutor explained:

He started small. The defendants felt their way.

Only after the initial transactions did they formulate a specific plan, only when they saw the enormous potential of an entire industry that operates solely on the basis of trust. Only when they saw that millions worth of dollars of goods can change hands on a handshake, on a person's word. What enormous potential that is to a man and a woman to whom a handshake and to whom trust means nothing.

Here, the prosecutor was interpreting evidence that showed introductory transactions between Heimann and his victims which may or may not have been accompanied by a preconceived intent to defraud. The interpretation he chose to place on this evidence, which was entirely consistent with the theory of the indictment, was that Heimann did not and perhaps could not work out the precise details of the fraudulent scheme until sometime after the scheme was in progress.

The third incident relied upon by Heimann occurred in the government's rebuttal summation when the prosecutor remarked that during defendant's summation counsel had talked:

a lot about the June 1979 transactions, and the transactions through March of 1980. There wasn't any controversy about any of those. The government says those were paid. Defense counsel say they are paid. So what? That's what he spent about half his time on.

The trial court and defendant both interpret this statement as an indication that the government had abandoned its allegation that the payments made prior to June 1980 were a part of the scheme to defraud. We do not agree. In our view, this remark was consistent with the government's theory of the case, as charged in the indictment and

as proved at trial. The comment merely reflected the government's position that there was no dispute over the fact that defendants had made payments for the earlier memorandum transactions. But the fact that payments were made must be distinguished from the critical question of the intent behind the payments. Since the thrust of defendant's case was that the many late payments in the early transactions negated an intent on the part of Heimann to defraud the merchants, it was particularly appropriate for the government on rebuttal to show that the making of those payments, whether timely or late, was quite consistent with a fraudulent intent. Moreover, it was an appropriate, effective, and permissible argument technique for the prosecutor to point up the obvious weakness of a defendant who would argue extensively about facts that were undisputed.

It must also be remembered that in a fraud case the government would be at a particular disadvantage if pressed to prove exactly when a defendant's intent first turned fraudulent. While the defendant himself might know the exact time, he is not likely to admit it, and only rarely could the government prove such a subjective event with precision. Consequently, the government is not required to establish the precise birth date of the fraudulent scheme; it is sufficient to prove the scheme existed at the time defendant used the mails for the purpose of executing the scheme.

Thus, we conclude that there is no basis for the trial court's findings that the government had abandoned the allegations of the indictment and that there was a variance between the charges in the indictment and the proof at trial.

### C. *Prejudice*

■ Even if we were to assume a variance between the indictment and the proof, there was absent from this trial the prejudice necessary to give legal significance to such a variance. Rule 52(a) of the Federal Rules of Criminal Procedure instructs us to disregard any "variance which does not affect substantial rights". In the same spirit,

case law instructs that variances should not be regarded as material where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense. *Berger v. United States,* 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935).

We do not know what prompted the trial judge to conclude that prejudice was "obvious" and "substantial", because he did not tell us. However, applying the above principles, we fail to see how defendant could possibly have been prejudiced.

First, as we have already indicated, the proof substantially corresponded to the allegations.

Second, defendant could not have been misled. By the indictment defendant was clearly apprised that his use of the mails and wires on various dates between March 2, 1980 and December 22, 1980 in furtherance of a fraudulent scheme placed in issue his intent with respect to each of the transactions to which the specific communications applied. Faced with such charges, no lawyer could seriously believe that by negating a fraudulent intent for part of the time when the scheme was alleged to exist, his client would escape criminal responsibility in the face of evidence establishing that the fraudulent intent did exist at the most relevant times: when the letters were mailed and the telegrams sent. This is particularly true, because

> "It is a general rule of law that where time is not an element of an offense, a variance between the date alleged and the date proved is not material and that proof of the commission of the crime on any day from the finding of the indictment, and within the statute of limitations, is sufficient.

*United States v. Krepper,* 159 F.2d at 964.

Third, even if the government's evidence were to be viewed as a variance, since the proof was somewhat narrower than the allegations of the indictment, defendant would be fully protected against a subsequent prosecution for the same offenses.

Departing from the standards of *Berger,* defendant claims prejudice in a number of other ways. First, he says that "the whole strategy of the defense was ridiculed" when the government in its summation pointed out that there was no dispute that the payments had been made through June of 1980. Even if this constituted a change in theory, and as indicated earlier we do not think it did, it did not prejudice the defendant, because the narrower theory was clearly permissible under the indictment, and defendant had no right to expect an acquittal because the time period of his fraudulent scheme was shorter than alleged. *Cf. United States v. Colasurdo,* 453 F.2d 585, 590 (2d Cir.1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972) (elimination of allegation from indictment not prejudicial where effect was to narrow rather than to broaden conspiracy count).

Defendant also claims prejudice, contending that if he had known that the earlier transactions were not in controversy, then he would have "re-focused" his defense to show that the value of the merchandise remaining in the auction houses was sufficient to satisfy outstanding creditors, and thereby establish defendant's reasonable belief that the November 1980 auctions would have resulted in everyone being paid. In effect, defendant is arguing that he focused his defense upon a period of time when the victims did not lose money and withheld evidence that would have negated or at least mitigated the losses claimed by the victims in the latter months. Such a claim is incredible. While technically the success or failure of a scheme to defraud is irrelevant in a mail fraud case, *United States v. Eskow,* 422 F.2d 1060 (2d Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970), realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence. We simply cannot accept defendant's contention that because the scheme to defraud described in the indictment was alleged to

run from January 1978 to December 1981, he did not believe it necessary or worthwhile to present evidence that would have negated the fraudulent intent during the period when harm was inflicted on the victims. *Cf. United States v. Tramaglino, supra* (rejecting claim that variance in proof prejudiced defendant's ability to present an alibi defense).

Our rejection of these contentions is reinforced by the presence in the indictment of counts 16 and 17, which allege interstate transportation of goods in September and December 1980 "knowing the same to have been converted and taken by fraud." Those felony charges dealt with the same time period that defendant claims he neglected in his proof. But they did not involve a scheme to defraud over any particular period; they merely required that the transported goods be "taken by fraud". When faced with two such charges, defendant would have presented evidence negating fraud in the latter part of 1980 if he had it available. His present claim to the contrary is at best unreasonable, at worst unbelievable.

Defendant's last two claims of prejudice are both frivolous. In one he argues that if the government had charged a scheme to defraud of only six months rather than two years, then bail would not have been as high, and the defendant would have been available to assist counsel in trial preparation. The other is that if the indictment had charged a six-month rather than two-year fraud, then he could have convinced the United States Attorney's office to withhold prosecution of what was essentially a "civil collection case". Since both of these claims focus on pre-trial proceedings, neither has anything to do with prejudice which might have resulted from a variance between the allegations of the indictment and the proof that was presented at trial.

Heimann also argues that the pattern of the jury's verdicts confirms the existence of a prejudicial variance between the indictment and the proof at trial. He claims that because he was convicted only on counts relating to transactions occurring on or after September 22, 1980, the jury must have determined that he formed no fraudulent intent prior to that time. But this does not necessarily follow. First, since jurors' verdicts need not be consistent, *e.g., Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *United States v. Zane,* 495 F.2d 683, 690 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); *United States v. Fiorella,* 468 F.2d 688 (2d Cir.1972), *cert. denied,* 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974); *cf. United States v. Carbone,* 378 F.2d 420, 423 (2d Cir.), *cert. denied,* 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967), it would be inappropriate to draw an inference from the pattern of verdicts as to the jury's findings on separate elements of the crimes.

Second, the pattern of verdicts is not as consistent as defendant implies. He asserts that the jury found no fraud with respect to all transactions prior to September 22, 1980. But this simply is not true, since the jury found Heimann guilty on both counts 2 and 3, which involve letters mailed on August 29, 1980 and September 17, 1980, respectively. Furthermore, while it is true that the nine counts on which defendant was convicted all involved transactions occurring after August 28, 1980, it is equally true that four of the counts on which he was acquitted (counts 7, 10, 11 and 15) also occurred in that period. Consequently, even if we were permitted to draw an inference from the verdicts as to the jurors' determinations of when the scheme to defraud was devised, we would not draw the inference urged by the defendant.

The judgment of acquittal is reversed, the verdicts of guilty are reinstated, and the case is remanded to the district court for sentencing.