**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1002
_____

UNITED STATES OF AMERICA


v.

AARON DAVIS,
                                        Appellant


_____

On Appeal from the United States District Court for the
District of Delaware
(District Court No. 1-19-cr-00101-001)
District Judge: Hon. Leonard P. Stark

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 8, 2022


(Filed: January 17, 2023)

Before:  JORDAN, SCIRICA, and RENDELL, *Circuit Judges*.
_____

O P I N I O N*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**RENDELL**, *Circuit Judge*.

Defendant-Appellant Aaron Davis challenges his conviction for taking part in a large fraud scheme that targeted financial institutions, a healthcare company, and the Government. He lodges two objections. The first is to the District Court's admission of victim impact testimony from a representative of the targeted healthcare company that lost money due to the scheme. The other is to the Government's urging the jury to use common sense during the portion of the Government's closing argument about willful blindness, which Davis construes as a "Golden Rule" instruction. For the reasons set forth below, we reject Davis's arguments and will affirm.

I.[1]

In the summer of 2017, Davis and a few accomplices hatched an ambitious fraud scheme. The group targeted two banks, a nonprofit healthcare company called Sutter Health, and the Social Security Administration ("SSA"). The plan unfolded in three parts over a three-month period: they used a check kiting[2] scheme to steal money from the

---

[1] Ordinarily, we write not precedential opinions with the benefit of a written opinion from the District Court. But Davis's claimed errors arose from the District Court's oral rulings on his objections, none of which were reduced to writing. We do not fault the District Court for that decision under the circumstances. Still, the absence of a written opinion obliges us to explore the facts, procedural background, and legal analysis more fully than usual for a non-precedential opinion, and we do so here.

[2] Check kiting takes advantage of the lag time in the process banks use to reconcile the balances of accounts involved in a transaction between them:

> Check kiting is a systematic pattern of depositing nonsufficient funds (NSF) checks between two or more banks, resulting in the books and records of those banks showing inflated balances that permit these NSF checks to be honored rather than returned unpaid. In addition, other checks and

banks; a business email compromise[3] scheme to steal money from Sutter Health; and a wire fraud scheme to steal SSA funds by applying for benefits in the name of a retiree without his knowledge or consent.[4]  But the banks involved quickly grew wise: they froze Davis's accounts and, by doing so, limited the group's theft to just over $225,000 of the $1.3 million they managed to deposit in the accounts through fraud.  A federal grand jury later indicted Davis for two counts of bank fraud, in violation of 18 U.S.C. § 1344(2);

---

> withdrawals may be honored against these inflated balances, resulting in actual negative balances, to the extent that banks allow withdrawal of uncollected funds.

Johnny S. Turner et al., Check Kiting: Detection, Prosecution, and Prevention, 62 FBI Law Enforcement Bulletin 12, 13 (Nov. 1993), https://www.ojp.gov/pdffiles1/Digitization/145802NCJRS.pdf.

[3] The FBI explained the nature of business email compromise scams in a recent report commissioned by Congress:

> BEC scams rely on deception and social engineering to convince victims— including companies, charities, schools, real estate purchasers, and the elderly—to send money, usually via wire transfer, to bank accounts controlled by criminal actors. While there are many variations, BEC schemes often involve the spoofing of a legitimate, known email address or the use of a nearly identical address to appear as someone known to or trusted by the victim. BEC scams are initiated when a victim receives false wire instructions from a criminal attempting to redirect legitimate payments to a bank account controlled by fraudsters; such scams are constantly evolving as criminals become more sophisticated.

Federal Bureau of Investigation, Business Email Compromise and Real Estate Wire Fraud, 4 (2022).

[4] Davis's scheme targeted Jay Abraham, who testified at trial that he had previously applied for Social Security benefits but never took disbursement of the money because, as a successful marketing consultant, he did not need to do so.  Abraham learned of Davis's fraudulent application purely by chance when Medicare denied his claims for treatment of a catastrophic medical condition because the disbursement of his Social Security benefits triggered irregularities in Medicare's claims process.

two counts of wire fraud, in violation of 18 U.S.C. § 1343; and one count of money laundering, in violation of 18 U.S.C. § 1957.

Davis's trial lasted five days, and the Government put on a dozen witnesses and introduced more than 100 exhibits to explain the nature and breadth of Davis's scheme. The Government's case included evidence showing the banks told Davis that they suspected fraud, though Davis and his cohort continued their efforts undeterred. The jury also heard that Davis alleged in a police report that the suspicious money appeared in his account because of fraud against *him*, and he supported those allegations with documents that law enforcement officials later found to be false.

During the trial, Davis challenged the Government's efforts to elicit so-called "victim impact testimony" from Sutter Health's Chief Financial Officer, Mark Wheeler. Wheeler testified that Davis redirected $1.1 million in company funds to his account and over $220,000 of that money remained outstanding. Having established the company's loss, the Government asked Wheeler to "tell the jury about the *impact* of [the] loss on Sutter Health." App. 613 (emphasis added). Davis quickly raised a relevance objection, arguing the impact on Sutter Health bore no relation to the charged offenses. The Government argued the testimony was "clearly relevant" because "the company was defrauded out of the lost money." App. 613. After weighing the objection and response, the District Court allowed Wheeler's testimony but did not explain its ruling.

Wheeler then told the jury that the losses hurt the company's ability to fulfill its mission:

4

> So I mean the impact for us—we're not for profit, you know, healthcare. We provide a lot of services in our communities. So missing money or losing money to fraud means less patients we can serve, less community impact we can have. We do a lot of charitable, charitable contribution to our individual communities so, yes, it had a financial impact. We've had negative years over the last two years operating losses. COVID has taken a toll. Fraud just continued to impact us, you know, or undermine what we can do in the community. So it is very impactful to Sutter Health.

App. 613–14. Davis challenged the testimony a second time after Wheeler finished and the jury left the room. He attacked on three fronts: he moved to strike the evidence as an unfair attempt to gain the jury's sympathy; he moved for a mistrial because the District Court would send a "mixed message to the jury" if it both allowed the testimony and issued an instruction to disregard sympathy and bias, App. 621, and he moved for the District Court to exclude the testimony under Federal Rule of Evidence 403 as unfairly prejudicial and lacking any probative value. This time, the Government defended the impact testimony as relevant to provide "color and background" for the jury about Sutter Health's monetary losses. App. 624.

The District Court made an oral ruling from the bench denying each of Davis's objections. To begin, Wheeler's testimony did not call for a mistrial, and in any case, Davis offered the District Court no standard to determine whether he was entitled to the relief he sought. The motion to strike was also a non-starter: Wheeler's testimony "*was* relevant, perhaps not highly relevant, but relevant to complete the background of the story as to why Sutter Health" was part of the proceedings. App. 626.

5

Finally, the reasons for denying Davis's first two challenges also persuaded the District Court that the Rule 403 balancing test did not favor exclusion—especially since Wheeler's testimony confirmed "what the jury probably already inferred." App. 626. The District Court also concluded that sufficient safeguards were in place to mitigate Davis's risk of suffering unfair prejudice from Wheeler's testimony: the jury had already been instructed not to let sympathy or bias govern their decision and would receive that same instruction before closing arguments; the court was willing to give a limiting instruction of Davis's choice; and at the end of the day, Davis was challenging "one question in the context of . . . 15 minutes or so of testimony." App. 625. Yet when the District Court followed up on its offer to give the limiting instruction Davis preferred, he declined.

Later, the Government's closing argument to the jury about Davis's state of mind provoked a fresh objection from him. The Government described Davis's multiple attempts to withdraw funds after the banks confirmed their fraudulent nature, posing a set of rhetorical questions and a proposed response: "[a]t the very least, did the defendant stick his head in the sand? Was he willfully blind to whether the money in that account belonged to him? Absolutely he was." App. 1366–68. Then the Government asked the jury to imagine how they would have reacted to the unexpected appearance of several large deposits to their bank accounts from unknown sources like the ones Davis received:

> But members of the jury, also just listen to your common sense. Ask yourself, if $1.3 million from unknown or strange sources showed up in your account, wouldn't you want to find out where the money was coming from? Wouldn't you wonder why some company you have never heard of was depositing

6

over a million dollars into your account?  Why the Social Security Administration was sending you tens of thousands of dollars when you had never filed for benefits?  Wouldn't you ask yourself why you were getting checks for 5, 20, 40, $75,000 from people you had never met?  Wouldn't you leave that money alone, especially after you had been told that the money was likely fraudulent, until you could figure out what was going on?

App. 1359–60.  Pressing that theme further, the Government referred to the specific deposit of SSA funds to Davis's account and asked the jury once again to contemplate what they would have done if similar deposits landed in their own accounts:

Well, it was right there in black and white on his statement, because the money that was being deposited was from the SSA Treasury of the Social Security Administration Treasury, $21,195.  And even if the defendant didn't know what SSA treasury means, members of the jury, ask yourselves if $21,000 showed up in your account and you didn't know where it was coming from.

App. 1373.  Davis objected to the Government's appeal as an improper "Golden Rule" argument and requested a mistrial, though when pressed by the District Court, he could provide no authority for the objection.  So the District Court overruled Davis's objection,[5] reasoning that the Government's argument was "entirely consistent with the [willful] blindness instruction" the jury was given earlier, which required the jury to "use their common sense and think about what a reasonable person might do if they saw a deposit they didn't know about in their account."  App. 1375.

---

[5] Despite overruling the objection, the District Court gave Davis the chance to file supplemental briefing "at any time" to support his position.  App. 1375.  Nothing in the record reveals Davis took the District Court up on its offer.

In the end, the jury deliberated less than two hours before convicting Davis on all counts. On December 21, 2021, Davis received a 36-month prison sentence. Davis timely appealed his conviction.

## II.

We have appellate jurisdiction under 28 U.S.C. § 1291, while the District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We review a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Desu*, 23 F.4th 224, 233 (3d Cir. 2022) (internal citation omitted).

## III.

Davis presents three issues on appeal: (1) whether the District Court committed prejudicial error when it "admitted victim impact testimony during the Government's case-in-chief"; (2) whether the District Court committed prejudicial error when it "allowed the Government to make [a] Golden Rule argument during its closing"; and (3) "[e]ven if the above errors were individually harmless . . . [whether] their cumulative effect [was] prejudicial[.]" Appellant's Br. at 2. We need only address the first two issues because we find no error.

First, Davis relies on *United States v. Copple*, 24 F.3d 535 (3d Cir. 1994) and *United States v. Sokolow*, 91 F.3d 396 (3d Cir. 1996) to argue that victim impact testimony is inadmissible. But Davis reads those cases too broadly. We explained in *Copple* that the difficulty of proving a defendant's specific intent in fraud cases requires "a liberal policy . . . to allow the government to introduce evidence that even peripherally bears on the question of intent." 24 F.3d at 545. In that way, evidence that "someone

8

was victimized by the fraud" provides us with "some evidence of the schemer's intent." *Id*. (citing *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983)). Further, evidence of a victim's loss suffices to prove the defendant's specific intent to defraud, as does evidence of "the defendant's failure to take any steps to ameliorate the loss." *Id*. (citing *Anderson v. United States*, 369 F.2d 11, 15 (8th Cir. 1966)). The same goes for testimony about the effect of those losses, but we have cautioned district courts to "exercise their wise discretion" and admit only testimony that is "reasonable to prove [the defendant's] specific intent to defraud." *Id*.

Considering that framework, *Copple* and *Sokolow* offer Davis little help. *Copple* featured a group of funeral directors who fell victim to a huckster promising to manage assets the funeral directors used to fund the prepurchase of funeral services. 24 F.3d at 538–40. Not only did the district court admit evidence that the funeral directors lost money in the scheme, but it also admitted the testimony of multiple directors about the negative impact[6] of those losses. *Id*. at 545–46. We agreed that the district court abused its discretion when it admitted the testimony, but we qualified that assessment: the district court did not err by admitting *any* impact testimony; instead, the error arose from admitting *too much* testimony and from the fact that some of it "went beyond anything that was reasonable to prove [the defendant's] specific intent to defraud." *Id*. at 545. The same was true in *Sokolow*, where we observed that the district court's decision to admit

---

[6] Among other things, the funeral directors testified that the loss of the funds forced them to raid their children's college funds and other personal savings and caused adverse effects on their health. *Copple*, 24 F.3d at 545–46.

the impact testimony of *twenty witnesses* "provided significant embellishment concerning adverse personal consequences" since the Government asked "*every* victim who testified whether [they] suffered any adverse consequences from the unpaid claims" in a clear attempt "to highlight [their] personal tragedies." *Sokolow*, 91 F.3d at 407 (alterations and emphasis added).

*Copple* and *Sokolow* thus boil down a simple proposition: district courts *may* admit victim impact testimony, but they may not admit too much of it, nor can they admit testimony that goes "beyond anything that was reasonable to prove [the defendant's] specific intent to defraud." 24 F.3d at 545. Unlike in those cases, the victim impact testimony offered against Davis checks neither of the forbidden boxes. Davis points to a single witness—Wheeler—who testified on behalf of a corporation, rather than a natural person. In response to the Government's question about the impact of Davis's fraud, Wheeler gave a single response about Sutter Health's diminished ability to serve its community. Yet the Government chose not to venture beyond Wheeler's single answer even though the scope of Sutter Health's loss and its impact on the company's charitable mission likely would have justified a deeper inquiry than the Government undertook. So the District Court did not err when it allowed Wheeler's testimony.

Davis's "Golden Rule" argument fares no better. Davis says the Government committed misconduct when it "directed Jurors to make findings about [his] state of mind by placing themselves in his shoes at the time of the offense and to ask themselves what their own state of mind would have been in those circumstances." Appellant's Br. at 16. He urges that the alleged misconduct deprived him of a fair trial—and entitles him to a

10

new one—because the Government's argument led the jury "to convict Davis in comparison to their own sense of innocence" and not based on the evidence. Appellant's Br. at 16. We disagree.

The bottom line is that Davis's position rests on a misunderstanding of "Golden Rule" arguments. Like other advocates, prosecutors can "make[] effective use of themes, metaphors, and references to popular culture" in their arguments to a jury. *Gov't of the Virgin Islands v. Mills*, 821 F.3d 448, 458 (3d Cir. 2016). But "Golden Rule" arguments "cross the line" and amount to misconduct because they are emotional appeals that "invite the jury to render a decision on grounds of bias, passion, prejudice, or sympathy." *Id*. Those arguments take two basic forms. One is where prosecutors make an improper "put yourself in the defendant's shoes argument" that "encourages the jury to depart from neutrality" and decide the case based on "personal interest and bias rather than on the evidence." *Edwards v. City of Philadelphia*, 860 F.2d 568, 574 (3d Cir. 1988) (quoting *Spray–Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982)). The other is where prosecutors use "comments like 'it could have been you' the defendant killed or 'it could have been your children'" so that jurors "identify individually with the victims," or try to scare jurors into a conviction "by predicting that if they do not convict, a crime wave or some other calamity will consume their community[.]" *Mills*, 821 F.3d at 458 (quoting *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009)).

The Government did nothing of the sort in Davis's trial. Rather, as the District Court concluded, the Government's argument was "entirely consistent" with the earlier instruction on willful blindness. App. 1375. That instruction gave the Government two

11

ways to prove Davis's fraudulent intent. The more direct way was to show Davis actually "knew of the fraudulent nature of the deposits." App. 1324. The alternative route was to show Davis "acted with deliberate disregard" as to "whether the deposits were legitimately intended for him or with a conscious purpose *to avoid learning* whether the deposits were legitimately intended for him." App. 1324–25 (emphasis added).

Read against that backdrop, and in light of Davis's conduct regarding the deposits to his account, the Government's argument gave the jury a way to test whether Davis acted with the intent required by the charges against him. All the more because the Government prefaced its argument with a recap of the evidence showing Davis kept trying to withdraw the stolen money after multiple bank representatives raised red flags about it and then cast himself as a victim of fraud. Not only that, but the Government also drew an explicit link between that evidence and the concept of willful blindness when it asked jurors if Davis had "st[uck] his head in the sand" or was "willfully blind to whether the money in [the] account belonged to him[.]" App. 1366–68. And how was the jury to determine whether those things were true? By doing precisely what the Government asked them to do: "use their common sense" to consider "what a reasonable person might do if they saw a deposit they didn't know about in their account." App. 1375. The Government's request was appropriate, and it did not invite jurors to substitute bias, prejudice, or fear for the evidence before them.

Yet, Davis tries to sidestep all of that by pointing to two of our cases and two cases from our sister courts. None get him very far. Start with our decisions in *Mills* and *Edwards*, both of which featured prototypical "Golden Rule" arguments. In *Mills*,

12

prosecutors argued that jurors "were not safe in their home" while the defendant remained at large, and they sowed further fear of an "ongoing threat to schoolchildren created by the [defendant's] discarded gun[.]" 821 F.3d at 458–59. That led us to call out the prosecution for coaxing jurors into a decision based on "bias, passion, prejudice, sympathy" and fear created by the "specter" of "purely 'inflammatory'" public safety concerns. *Id*. at 458–59. In a similar vein, we recognized in *Edwards* that counsel's opening statement instruction was inappropriate in telling jurors that they should not only *listen* to the defendant police officer's testimony, but they should also "put [themselves] in his shoes," "see through his eyes that evening," "hear what he heard," and "try to experience was he was feeling." 860 F.2d at 573 n.5; *see also id*. at 575 (finding that the District Court's final instructions "sufficiently negated any prejudice that might have resulted from [defense] counsel's errant arguments to the jury."). In sum, *Mills* and *Edwards* involved blatant "Golden Rule" appeals that bear no resemblance to the Government's benign—and necessary—argument about Davis's state of mind.

For somewhat different reasons, our sister courts' decisions in *United States v. Teslim*, 869 F.2d 316 (7th Cir. 1989) and *United States v. Palma*, 473 F.3d 899, 901 (8th Cir. 2007) do not rescue Davis's claim. In *Teslim*, a defendant convicted for drug-related offenses alleged that prosecutors encouraged jurors "to disregard the presumption of innocence" when they placed a cloud over his behavior during the pivotal stop by saying "if it happened to you, and you had nothing to hide . . . ." 869 F.2d at 327–28. True enough, *Teslim* involved a similar sort of appeal to the jury, but the defendant faced the wrong kind of charges to help Davis: that defendant's drug charges made the prosecutor's

13

statement inappropriate, while Davis faced fraud charges that made it necessary for jurors to probe his state of mind in the way they did. And *Palma* presents the mirror image problem: it has the right kind of charges (social security fraud) but the wrong kind of appeal to the jury (inflammatory remarks about how the defendant's fraud stole money from *them*). 473 F.3d 89. None of these cases help Davis's cause, and his "Golden Rule" argument fails.

## IV.

In sum, the District Court did not abuse its discretion in connection with the rulings Davis challenges, and we will accordingly affirm.